# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| DORTHEA JOHNSON, JASON PLAYER, TOM VENSKY, and CHARLES WARTELLE, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | Hon. |
| v. | CLASS ACTION COMPLAINT |
| FCA US, LLC, | DEMAND FOR JURY TRIAL |
| Defendant. | |

| | |
|---|---|
| FINK BRESSACK | WEBB, KLASE & LEMOND, LLC |
| David H. Fink (P28235) | E. Adam Webb |
| Darryl Bressack (P67820) | 1900 The Exchange S.E., Suite 480 |
| 38500 Woodward Ave., Suite 350 | Atlanta, GA 30339 |
| Bloomfield Hills, MI 48304 | (770) 444-0773 |
| (248) 971-2500 | Adam@WebbLLC.com |
| dfink@finkbressack.com | |
| dbressack@finkbressack.com | |
| | |
| *Attorneys for Plaintiffs* | *Attorneys for Plaintiffs* |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Dorthea Johnson, Jason Player, Tom Vensky, and Charles Wartelle by and through their undersigned counsel, on behalf of themselves and all others similarly situated, hereby submit this Class Action Complaint and allege the

following based on personal knowledge as to allegations regarding Plaintiffs and on information and belief as to other allegations.

## INTRODUCTION

1.      Defendant FCA US, LLC has knowingly sold a defective product throughout the United States since at least 2014.  Despite thousands of complaints, Defendant has failed to acknowledge the defect and has refused to fix the problem. This means vehicle owners are forced to suffer a prominent and unsightly defect or spend hundreds, or even thousands, of dollars for repairs.  The defect at issue also raises serious safety concerns about the proper operation of side air bags, door locks, anti-theft mechanisms, and heating/cooling systems.  The public complaints about this defect have become so widespread – with dozens of websites devoted to thousands of customer complaints – that the value of the vehicles at issue has been substantially reduced.  This case seeks a fair and equitable resolution for victims of the defect.  Such a resolution should include, at the very least, a program to fix the defect and compensation for those who have been forced to complete repairs on their own.  Other relief is also needed to make owners and past owners whole.

## PARTIES

2.      Plaintiff Dorthea Johnson is a retiree living in Palmdale, California. In early 2019, Mrs. Johnson purchased a used 2016 model Chrysler 300C.  The

vehicle was manufactured, marketed, and sold by Defendant.  She still owns this vehicle.

3.      Plaintiff Jason Player lives in El Paso, Texas.  In December of 2015, Mr. Player purchased a new 2016 model Dodge Charger manufactured, marketed, and sold by Defendant.  He still owns this vehicle.

4.      Plaintiff Tom Vensky is a retiree living in Warrenton, Oregon.  Mr. Vensky owns a 2016 model Dodge Charger R/T that was manufactured, marketed, and sold by Defendant.  He still owns the vehicle.

5.      Plaintiff Charles Wartelle lives in Folsom, Louisiana.  Mr. Wartelle purchased a used 2017 Chrysler 300C.  The vehicle was manufactured, marketed, and sold by Defendant.  He still owns the car.

6.      Defendant FCA US, LLC is the primary United States subsidiary of Fiat Chrysler Automobiles, N.V. which is one of the world's largest manufacturers of cars and trucks.   Defendant makes and sells all Chrysler, Dodge, Jeep, and Ram vehicles in the United States.  Defendant was formerly known as Chrysler Group, LLC, Daimler Chrysler AG, and Chrysler Corporation.  Defendant is headquartered in Auburn Hills, Michigan in this District.

7.      Defendant supplied the capital and approvals necessary to design, manufacture, market, and sell the vehicles at issue in this case.  Defendant employed legal, compliance, and regulatory personnel to make decisions regarding

the vehicles at issue in this case.  These employees ultimately made or ratified the decisions that allowed the vehicles at issue to be sold in breach of Defendant's warranties as more fully set forth below.  Defendant is responsible for all representations and warranties made as to the vehicles at issue.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), which provides for federal jurisdiction in class actions with minimal diversity when damages exceed five million dollars, exclusive of interest and costs. The Court has supplemental subject matter jurisdiction over any pendent state law claims pursuant to 28 U.S.C. § 1367.

9.     Defendant is headquartered in Auburn Hills, Michigan, whereas Plaintiffs are citizens of several other states.   The proposed class consists of customers of Defendant in all 50 states and other United States jurisdictions. Defendant has sold at least 800,000 of the defective vehicles during the proposed class period.  Because repairs of the defect at issue cost on average over $100 per defective panel, and multiple defective panels are at issue for most customers, the total claims will far exceed five million dollars.

10.     Defendant is headquartered in this District and is subject to suit here. Defendant sells many vehicles every month in this District.  It has a network of

dealerships selling Chrysler, Dodge, Jeep, and Ram vehicles throughout the state and District.

## **PROCEDURAL BACKGROUND**

11.    Plaintiffs Johnson and Player filed a case concerning the Defect (as defined below) in the United States District Court for the Central District of California on or about September 10, 2020.  *See* Dkt. 1 in Case No. 2:20-cv-08314. Plaintiff Johnson was a resident of that District.

12.    After the complaint was filed, the case received publicity on Internet message boards dedicated to Dodge Charger and Chrysler 300 vehicles.  Counsel for Plaintiffs Johnson and Player were contacted by numerous other victims of the Defect that wanted to get involved, including by serving as class representatives.

13.    Based on the number of contacts in a brief period of time and the fact that follow-on cases are typically filed whenever an automotive defect of this magnitude is exposed, Plaintiffs decided to combine their case with others and to file the case in Defendant's home district.  When multiple cases are filed regarding the same automotive defect, a multi-district litigation to manage the cases is often created in the most suitable district.  Often the district chosen is the one where the greatest number of potential witnesses reside, which is usually where the defendant is headquartered.

14.     Because this District is the most suitable venue for a multi-district litigation, should one ultimately be necessary, given the Defendant is headquartered here, and most of the witnesses and documents are likely located here, the California action was dismissed without prejudice on September 22, 2020 and the claims of all Plaintiffs joined herein.

## **FACTUAL BACKGROUND**

15.     Defendant is the third largest automotive manufacturer in the United States.  It has dealerships throughout the United States, including many dealerships in California and this District.

16.     Defendant maintains the Chrysler brand.  The Chrysler 300 is a four-door luxury sedan that has been sold by Defendant at all relevant times, including from 2014 through today.  An average of roughly 50,000 Chrysler 300s have been sold in the United States in recent model years.

17.     Defendant also maintains the Dodge brand.  The Dodge Charger is a "muscle car" currently in its seventh generation.  It has been sold by Defendant at all relevant times, including from 2014 through today.  An average of roughly 90,000 Chargers have been sold in the United States in recent model years.  The Dodge Daytona is a modified version of the Charger that has also been sold during the relevant time period.  General mentions of the Charger herein include the Daytona.

18.   All Chrysler 300s and Dodge Chargers sold in the United States from the 2014 model year through the 2021 model year shall be referred to herein as the "Subject Vehicles."  Defendant continues to knowingly sell Subject Vehicles with the defects described below.  If such sales continue after the 2021 model year, then the term Subject Vehicles should be read to include any future model years in which the defect remains uncorrected.

19.   Unbeknownst to consumers, Defendant designed, manufactured, distributed, marketed, and sold the Subject Vehicles with a particular defect – defective interior trim panels which peel away from the adjacent surface of the vehicle frame (the "Defect").  Some customer complaints refer to the problem as "delamination" of the panels.  The Defect is most prominent on the front doors – both driver and passenger sides.  Essentially the interior door panels begin to separate and rise up next to the window, generally expanding to cross nearly the entire bottom of the window.  This also happens to a slightly lesser extent on the rear door panels.  The Defect also afflicts smaller panels that pull away from the center console area between the driver's seat and the front passenger seat.  Lastly, the dashboard also pulls away from the front windshield.

20.   Several photos of the Defect have been attached hereto as Exhibit 1.

21.   Defendant knew about the Defect well before Plaintiffs – and the vast majority of members of the proposed class – ever purchased their vehicles.  On

information and belief, Defendant learned of the Defect at least as early as 2015 through sources such as: pre-release evaluation and testing; investigations in response to dealer service departments; repair data; replacement part sales data; early consumer complaints made directly to Defendant and its authorized service agents, and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from authorized dealers; as well as through other internal and external sources that cannot be confirmed by Plaintiffs prior to discovery.  Nevertheless, Defendant did not take steps to correct the Defect during the manufacturing process and it actively concealed the Defect from customers and continued to market the Subject Vehicles in a manner that misrepresented the quality of the defective interior trim.

22.    Because the nature of the Defect is that the degradation occurs over time, it is a hidden defect of which customers are not aware at the time of purchase.  Indeed, given the substantial cost of the Subject Vehicles – these are not low-end cars, but rather have an average price in excess of $40,000 – the Defect is the furthest thing customers would or should expect.

23.    Defendant provides comprehensive warranty coverage to customers after the initial purchase of a Subject Vehicle.

**B. What's Covered**
The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or

factory preparation. There is no list of covered parts since the only exception are tires and Unwired headphones. You pay nothing for these repairs. These warranty repairs or adjustments — including all parts and labor connected with them — will be made by your dealer at no charge, using new or remanufactured parts.

*E.g.*, 2016 Chrysler "All Vehicles" Warranty Booklet, p. 5; 2016 Dodge "All Vehicles" Warranty Booklet, p. 5.  This coverage, however, only lasts for 3 years or 36,000 miles and ends whenever either one of these benchmarks occurs.  The powertrain warranty is longer but is not at issue in this case.

24.    If the Defect manifests during the warranty period, Defendant generally offers to replace the interior panels at issue.  The replacement panels, however, have the same Defect and will eventually separate from the frame and become warped and deformed like the replaced panels.  Thus, Defendant has failed to provide a permanent, in-warranty fix for the Defect.  This partial or temporary fix does not meet Defendant's obligation pursuant to the warranty.

25.    Further, despite Defendant's knowledge of the Defect and the number of cars affected, it has not taken appropriate steps to order the replacement parts it knows will be needed.  Thus, customers are forced to wait on average several months for the repair to be completed.  Defendant's goal in refusing to make repairs in a reasonably prompt fashion is obvious: some customers will forgo the repairs, have the repair completed elsewhere, or neglect the repair until their

warranties expire, thus saving Defendant the cost of making the in-warranty repairs.

26.    Generally, vehicles are out of warranty when the Defect manifests for the second time.  Defendant's policy is not to pay for repairs or replacements to correct the Defect outside of the warranty period, including for those who received the sub-standard repair during the warranty period.  Even customers who have purchased add-on warranty products are told that the Defect is not a covered item.

27.    Some customers observe the Defect for the first time only after the expiration of the warranty coverage.  Defendant's policy is not to pay for repairs or replacements to correct the Defect for these customers.  Once again, even customers who have purchased add-on warranty products are told that the Defect is not a covered item.

28.    Defendant has never informed owners of the Subject Vehicles that it has become aware of the Defect, although it has been aware of the Defect since at least 2015.  Although it has the means to provide such notice, Defendant has never provided notice of the Defect to customers who have purchased or currently own the Subject Vehicles.  Even worse, Defendant continued to manufacture and sell Subject Vehicles with the Defect for several years after the Defect was well known to Defendant.  In order save money, Defendant chose to unfairly saddle customers with the costs and risks of the Defect rather than simply reengineering the Subject

Vehicles.  There is no inherent reason why interior trim should pull away from the frame; this was a relatively simple fix, as can be seen in the many vehicles manufactured by Defendant that do not have the Defect.

29.    Despite thousands of customer complaints, and at least hundreds of notifications from the service departments at Defendant's authorized dealerships, Defendant has decided not to issue either a technical service bulletin or a recall notice regarding the Defect.  This decision has been made solely to save money.

30.    Recalls are appropriate when vehicles have a safety defect.  In most instances, the Defect results in serious safety concerns.  For example, when the front door panels separate from the frame – the most common manifestation of the Defect – the inner cavity of the door is exposed.  This necessarily alters the performance and safety engineering of the side airbags which are located in the door cavity.  The air bags are not engineered to have an open gap to shoot through, which renders the deployment of the bag uneven and not to safety specifications. The gap also facilitates theft by giving open and obvious access to the door-locking mechanism.  The Defect can also disable the ability to lock the vehicle when it rises to a level higher than the locked position of the locking pin.  The door gaps allow hot or cold air to enter the cabin without any insulation and can affect the ability to control the temperature in the vehicle.  In its worst manifestations, the

Defect presents multiple safety violations in several areas of the Subject Vehicles. In nearly all cases, the Defect presents serious safety concerns.

31.    The issuance of a technical service bulletin ("TSB") is appropriate where a well-known defect does not implicate consumer safety.  Even though the manufacturer does not necessarily pay for repairs under a TSB, the issuance of a TSB would still cost Defendant money.  First, the issuance of a TSB would lead many owners of the Subject Vehicle to seek repairs and replacements within their warranty period.  Defendant would be forced to pay for any such repairs during the warranty period.  Though temporary fixes, such repairs are still costly for Defendant to complete.  Second, a TSB would be mentioned by service personnel to customers at the time other service requests are being handled.  Because Defendant has to pay for such repairs within the warranty period, workers in service departments would merely be doing the neighborly thing by mentioning the TSB and potentially pointing out where the Defect has begun to manifest.  Third, the issuance of a TSB can discourage customers from purchasing new vehicles. Some potential buyers, and all expert automotive reviewers, check recall notices and TSBs.  Thus, a TSB about the Defect – which is a particularly unsightly and expensive defect – would significantly curtail sales.

32.    A selection from among the thousands of complaints about the Defect will illustrate the gravity of the problem.  For example, Defendant's own parts and

service affiliate Mopar has a Mopar Insiders website that includes a forum for Chrysler 300 and Dodge Charger customers that have suffered from the Defect. Here are several of the entries:

### clifton hundley

I have a 300c platinum and paid for the very expensive lifetime warranty. All four of my doors began coming apart I was told by FCA that my warranty did not cover door panels and that they would cost 2500 each to fix and that the new panels would not be under any kind of warranty so basically they wanted me to pay 10000 which is a lil less than a quarter of the total cost of the car for new panels with no guarantee that this won't happen again. The total upgrade for the leather trim didn't even cost that much why are the panels so expensive. Seems like price gouging and taking advantage of an issue that they clearly have to know about

### Erik Thompson

Yes my 2017 sxt awd charger is having issues at both driver and passenger doors right at window material separating away from door panel looks bad will start to look under warranty.

### Elizabeth Chapman

Yes! Door panel on both driver & passenger side lifting! Driver side has already been replaced. So now new one is lifting as well. I have a 2016 sxt charger. So disappointed. We are ready to upgrade to a 2020 Charger Scat Pack but because of issues with this car we might not get another Dodge.....

### bruce spear

Bought a CPO 2016 Chrysler 300 with 11,000 miles on it. At 50,000 miles, the passenger side door panel is badly warping up, the panels on both side of my shifter have slowly started to warp up, and so has the rear passenger side door panel. I can't believe how much these vehicles cost & yet something like this happens. This is obviously an effect of poor quality control and/or using inferior products. Sorry to everyone else who is going through this!

**Quaneshia Harris**

I purchased a brand new 2017 Dodge Charger SE in October 2017. By August of 2018 my passenger side door panel, right below the window had lifted up. I thought it was from the heat of the sun and that eventually I'll be able to push it back down. It eventually got WORSE and when I took it back to the dealership, they mentioned it's a common thing and it's not covered under warranty. It's 2020 and I'm still riding around with the issue. It's pretty embarrassing when people enter my car.

**Michelle Scarfo Brock**

I own a 2016 Dodge Charger RT with 21,000 miles. Three of my door panels are lifting with the drivers panel being the worst. Started after manufacturer warranty and extended warranty does not cover this item. Contacted mopar which yielded no results or a reply. I have noticed that the console panel is lifting. Hubs says get rid of it! Has anyone thought about filing a class action suit against mopar to correct this issue?

**James Keddington**

Yes, front passenger side is delaminating, just like your pictures.

**Steven Troise**

Yes my 2015 charger with 9000 miles but this yr hit 5 yrs old just started popping up by the gear shifter also. Seems like its all heat related. temp outside hit 95 degrees but was over 110 in the car. car interior gets mushy and starts separating from the panels. I hope they do a recall and make panels better with better glue or epoxy

**Andrew Pate**

2016 Dodge Charger R/T. Major warping on the front door panels at the window and the back door panels looks like they are about to do the same. It's a known defect, something should be done about it.

**Sandra Butler**

We purchased a new charger SRT397 in 2017. It is just out of warranty. We noticed the other day both front door panels and the driver rear panel are all separating from the frame. We took the car to the local dealer and are waiting to hear back.

14

We have never had this type of issue on any previously owned car. We have had this expensive car for just over 3 years. If we are not using it, it is in the garage. We have 2 vehicles, so this is not heavily used. We have less than 20,000 miles on the car.

**Winston Clark**

I own a 2014 Chrysler 300. So far a wonderful car with not much trouble besides some recalls and a fuel system issue, all resolved by the Chrysler warranty. The warranty also replaced my passenger side door panel and the console trim to the right of my gear shift as described in the article due to the trim edges pulling away from the window and the console respectively. Disappointingly, the problem has returned in the same identical places as before. This has to be a manufacturer defect and when I contacted Chrysler the reception was not what I expected. I don't know when Chrysler realized that they had a problem but it was obvious then that it wasn't an issue with the warranty representative 2 years ago. My warranty has since expired; I feel that Chrysler should issue a recall to repair or replace these defective door and console panels and trim.

**The0bviousNinja**

I have a 2017 Daytona. I'm on my 3rd set of door panels. The passenger side of the console is just now starting this crap.

**Tim Bryant**

My 2017 Charger Daytona 392 is at the dealer right now for the drivers door and rear passenger side door panel. Luckily it is still under warranty until September. Guy in service dept said they are about $900 each to replace when out of warranty. Only 17k miles and ALWAYS garaged in SC.

**Chris Hale**

I bought a 2018 Charger Daytona new and I have delamination on both driver and passenger front doors around the windows.

**Roger N**

Our 2015 300s has had this issue for a while, both on the door and the center console. I would really like to see a complaint and lawsuit filed.

15

**Kate Frisbie**

I have a 2016 Dodge Charger SE and have both problems. My driver side door is delaminating and the trim of my console as well. Always thought it was something I had done to cause it, but it is exactly how you described. I normally get so many comments on my Charger but having the door and console delaminating is really embarrassing to me.

**sean Lewis**

My 2018 Scatpack charger has this same issue with the door panel and the shifter panel as well.

**Courtney 2016 Charger**

My 2016 charger passenger door panel has been lifting since before my warranty even expired. Yes, I paid extra for the extended warranty as well. I immediately took it to the dealership and they told me I'd have to pay full price for them to replace the door panel. Now I'm past my extended warranty. I expect dodge/mopar to do right by their customers and replace it. I'm very disappointed with my dealership and will be putting in a complaint with them.

**B.b.**

18 charger scat pack same thing door panels center very disappointed

**Chip L**

2015 Charger R/T Plus has delaminating console side panels (both side panels next to the gear shifter have peeled partially away / open). Started shortly after it went out-of-warranty, just over 3 years, so dealership refused to fix.

**Waleek**

Wow! Yes my 2018 Daytona door panel is doing the same thing but I'm out of warranty. I tried to glue it down and I hate it.

**Ron**

Have a 2017 300 C. Passenger door panel warped at top lifting up around where meets window. Very disappointing for their top of line vehicle.

**Melanie Gillard**
Hello, my name is Melanie Gillard. I have a 2014 Chrysler 300. Yes, the door panels are delaminating as well as the material around the console. It is disheartening ... I really like my car yet I don't think that I will purchase another one. Hopefully this issue will be taken care of soon, in addition to our satisfaction.

**Raymond BiggChoppa Watson**
Hey, My Name Is Raymond Watson And Yes My 2017 Dodge Charger Driver Side Window Started First And Now My Passenger Side Has Started. But I am Out Of Warranty. What Should I Do?

**CARLOS A PEREZ**
I have a 2014 Chrysler 300 and I am having the issue with the door panels and trim

See https://moparinsiders.com/does-your-charger-or-300-have-interior-issues/.

33.     An online discussion forum exists for most makes and models of vehicles.  There are websites for both the Charger and the 300 and each website includes an extensive discussion of the Defect.  Here are some examples from just one of the Charger threads about this issue:

Aug 7, 2017
Man I was just about to post about this. Hopped in my '16 SXT yesterday and my front passenger door panel decided it didn't want to be on the car anymore. Then checked and my driver side is just starting to show signs of curling up. Guess this is a common-ish problem? Luckily I'm still under warranty so I'll see what the dealership has to say tomorrow.

Aug 11, 2017
Just an update...made it up to the dealership today, service manager was hardly shocked. Said mine was not the first door panel issue he's seen, though mostly had seen it on '14 Chargers. I'm just an overachiever I guess. He said the other common one is the trim piece between the dash and console, he's done a dozen of those. He

recommended making sure there was no sign of warping on that prior to hitting the end of my 36K mile warranty.

Overall a great experience and one of the most helpful and least defensive service managers I've ever encountered. Had to order the door panel which is unfortunately backordered, which he said could mean 3 days or 3 months. Guess I'll be living with it for a while. FYI for those out of warranty, he said the door panel is $714 and some change.

Oct 11, 2017
**Same Issue - Covered by warranty**
Had the same issue with my 2015 Charger. Noticed all 4 door panels raising, got them fixed, and the next day noticed the trim on the sides of the console near the shifter doing the same. Car in the shop as I speak being replaced with a couple thousand miles left on warranty, and only a few months. Oh and btw, I'm also in Phoenix. Shocker. This issue is without a doubt heat related.

Mar 6, 2018
**2016 Charger door panels lifting off**
I have a 2016 Charger and I just noticed (2 years after i bought it) that my door panels were lifting off just as shown on the 2014 model. I went to the dealer and they told me that i was outside my warranty and that i can either call Mopar and file a claim or pay for it myself to replace the door panels. I looked online if there were others that had the same issues and found this and other forums that discussed this same issue. So i called my extended warranty and they said that interior door panels are considered wear and tear and not covered by the warranty. So i called mopar and they opened a claim for me. I will keep you posted as to the results.

Sep 19, 2018
Hello guys, new to this group I own a 2016 Dodge Charger R/T with 45,000 miles. I have only owned the car for 1 year 8 months. I also have the same problem with both my front door panels, the passenger side being the worst. The driver side just lifted up and the passenger side being warped/wavy. Seems like it is a common problem. Wonder why there is no recall on this.

Sep 22, 2018

**This is happening on my Chrysler 300S**

I live in Fl and this started happening to my 2015 Chrysler 300S. I've hit 53k miles so the bumper to bumper is out of warranty, BUT I have asked Class Action Lawsuits to see if they can start a class action for those of you who are getting denied the repairs due to being out of warranty. My dealership knows me and I told them that if they did not repair my vehicle, I'd write reviews on Google, Yelp, their website, and any other website until my situation was resolved. I don't understand how Chrysler/Dodge would even think about turning a customer away for this type of issue. Do they assume we're bored and have started to just peel away our door panels because we have nothing better to do than to sit in the 100 degree heat and destroy our cars? I've attached this link on the class action form I filled out also. Good luck to all!! Don't take no for an answer, regardless of warranty! I've learned that when kindness doesn't get you what your owed, then bad reviews seem to be the next best thing, especially for major dealerships.

Sep 26, 2018

I had the same problem on one of my doors about 6 months ago. Dealer took care of it. Replaced the whole panel with brand new one for free. But now the problem is happening on my other 3 doors.

Nov 11, 2018

**Another panel bites the dust**

I have a 2014 Charger with the driver side door panel lifting from the lock all the way to the vent! Where is that Class Action form if I need it?

Jan 7, 2019

My 2016 Dodge Charger SXT is having the same issue with both the driver side and passenger side doors. The dealer wants $1000 per door, which is insane.

Jan 7, 2019

How many miles on the car?

Actually I don't care if it's 200,000 - FCA should ABSOLUTELY be covering these because there is NO question it is a supplier/manufacturing problem. It's not like 3 or 4 cars have had this happen.

They better get on the stick with it before there's a class action lawsuit that ends up costing them far more.

Jan 7, 2019 (Edited)
Noticing it's been about half a year since "Dodge Cares" knew of this problem....Haven't seen any further input from them...The type of problem should not be tied to a particular Dealer...nor a particular owner, If Dodge Cares, really cares, wouldn't ya think they would intervene with some solution by now !! As they know we're all involved...

Jan 7, 2019
I could understand this thing happening after 6 years but not within 2 years of owning the car. Definitely a defect. I wonder if there's a good Samaritan lawyer that would like to take our case. 🤔

Feb 2, 2019 (Edited)
The bumper to bumper warranty should be 3 years or 36k miles from the in-service date.
However this is such a ridiculous problem to be having this many years into a vehicle's production run I really feel like Dodge should cover these panels no questions asked for at least 7 years/150k miles from ISD. @DodgeCares, are you out there? I would love to hear your thoughts on these failures.......

Feb 3, 2019
I've ignored this thread up until now because I felt the topic seemed so foreign to me.
Well while waiting in the car for my family today I noticed the top edge of my passenger door panel peeling up. I think driver and passenger rear panels are doing the same... I'll be calling the dealer Monday

2017 Charger SP w/ 25k miles

Aug 12, 2019
I have a 2016 RT and both passenger side and driver side are doing it. Like yours mine is out of warranty also. Dealer isn't going to do

anything. It is embarrassing that car can be this new and have these types of problems.

12 mo ago
I have a 2017 Chrysler 300C with 40,170 miles on it and have the same problem. I took it to my local dealer and they said that they could not do anything for me. The said to contact Chrysler. I did this and they said they would not be able to assist me. I have been buying mopars since 1974, when I mentioned this they said 'we understand your issue but we are unable to assist'. I them called the dealer that I have purchased at least 9 vehicles from since 1997. I have an appointment Monday. Hopefully they will offer some assistance with this issue. If not I may stop buying mopars.

12 mo ago
I have a 2018 charger that is doing only dealer serviced never touched by anybody else told them at least 6 times now I'm right out of warranty coverage also I have extended coverage that I purchased still no help that's not right thanks Rocky Williams

11 mo ago
I purchased a New 2018 Charger R/T, have had it for about 9 months, and the door console is lifting at the window... I thought someone was trying to get in the car(steal it) I called the police they said it was from heat. and my passenger side was starting to lift too.. I was so embarrassed I wasted their time... it's under warranty I'm going to dealership... I find it to be unacceptable that the expense of the car and quality of production aren't equivalent.... especially if there is a chance my dash could at some point lift too...

10 mo ago
I have 17 that is ugly. The passenger side door is the worst, and the drivers door is starting to look the same way. Dodge can/will do nothing since out of warranty.

10 mo ago
I have a 2015 Charger, and the door panels are peeling back also, and so is the console area, and now the top part of the door panel to the point you can see the air bag. I'm at a point I am scared to drive my car, what if the air bags pop out, this is serious business. Apparently

no one cares, if the warranty is over, they ( the dealership ) says you have to file a complaint, well I have done that also and still nothing is being done. So I want to know if anyone else is having the same issue and I see many folks are having the same problem. Chrysler needs to step up and get this taken care of. My seems to be getting worse by the day and this has been going on for over a year. I've taken my car to a couple of dealerships and they seem to drop the ball several times, and now of course all they say is no warranty no repairs. This is a defect and not just some issue. I have spoken to so many Service Adviser at Rockwall Dodge and at Denton Dodge and they all say, yes it's a problem but Chrysler is not taking this as a defect as of yet. I was told keep trying maybe the squeaky wheel will get the panels replaced at Chryslers expense. Truly concerned

10 mo ago
I took my 17 ScatPack to the dealer with 35,500 miles on it. I waited as long as possible to see if all the door panels would have the skin separate. Only the front two doors and the driver side knee bolster panel had enough "damage" to get replaced. Knee bolster was a day. Service advisor says panels door panels are on infinite backorder.

9 mo ago
Hello from Oklahoma - My passenger door panel is doing the same damn thing on my 2016 Charger R/T.. I have the B5 Blue Blacktop Edition and I'm beyond pissed off. This is my 4th Dodge and I have never come across this problem before but I will most likely NOT be getting another Dodge when I trade it in. Judging from this post, this issue has gone on for years but they don't care.. We pay good money for these vehicles - this is super frustrating.

8 mo ago
So my passenger side front panel is doing it now. The drivers side was replaced last year under warranty. Problem is no more warranty.(4 months out) The dealer will not budge on that. They will not fix it. They gave me the 800 Customer service number. So much for CPO!

7 mo ago
I have a 2017 Dodge Daytona and my passenger door is doing the same. I am out of warranty due to mileage. Dealer wants 750.00 to fix. I do not feel this should happen in only 2 years and this seems to

be a wide spread problem. Anyone having any luck with Mopar on this?

17 d ago
Even though I purchased extended warranty on this vehicle it is not covered...I would like to gather a class action lawsuit for this.... not to mention I won't buy another Chrysler product. Car is a 2015 34000 miles (weekend car) no way this should be happening

15 d ago
2016 Chrysler 300s AWD 52,000 miles. Passenger side door starting to warp where panel meets window, all doors have visible indications they could do the same. Add me to that law suit! $40k of hard earned money unacceptable quality control.

*See*      https://www.chargerforums.com/threads/door-panels-lifting-off-window-endge.335874/.

34.    A similar forum exists for Chrysler 300 owners.  A few of the many complaints about the Defect are listed here:

Jul 23, 2019 (Edited)
Brought my Chrysler in for normal maintenance with zero issues. When the car was returned to me, the front door panels on both the driver's side and passenger side are completely warped and separating from where the panel meets the window. This was NOT occurring prior to me bringing the car to the dealership in any way, shape or form. The amount of damage that occurred in that short of time is astounding.

The car was purchased 2/2017 and the damage occurred 6/1/2019, current mileage 22,967. The dealership, AutoNation Chrysler Jeep and Dodge North Phoenix responded with I am not in warranty and the damage is not covered even though this is a known defect. The price I was quoted is 1 door panel 302.95, the second is 274.85 and labor is 100.00 per panel. I had been talking to the Service Manager, Steve Rogers, who told me he can't do anything about it.

If this is a known issue, why is there any discussion about the panel replacement being covered? Pictures are attached. Does Chrysler REALLY "care" about their customers and quality?

Aug 3, 2019
I just had both my front door panels replaced under warranty for this exact issue. My service advisor told me this is a known issue on 300s since the 2015 redesign. Looked awful.

Aug 7, 2019
I'm having the same issue with the driver's side and passenger side on my 2017 300s. The dealer is no help and the extended warranty they sold me doesn't cover it. Thinking about fixing it myself. Not sure if anyone has tried or has a good adhesive to recommend.

11 mo ago
Spoke with 2 Chrysler reps today concerning the door panels. The first rep told me that to replace all 4 doors would cost $8,000. I found this figure incredulous! The entire package (seats, dash, console, and doors) cost $1,995 as seen here http://bestride.com/reviews/new-car-reviews/review-2016-chrysler-300c-platinum-american-cred.

I called Chrysler parts, and get this, the front door panels cost $2,200 each, and the rear $1,800 each. I asked how can the complete premium leather package cost $1,995 and replacement door panels cost $8,000? There was no clear answer except that maybe this particular package was discontinued and would have to be custom made for replacement purposes. That being the case anyone with the interior upgrade with this problem is in for a serious shock if out of warranty. No wonder they gave you hell for trying to get yours replaced.

Chrysler did say they had found a car upholstery who claims they can fix the current panels at no cost to me. I don't know if this is a blessing or not since the current panels appear deformed.

10 mo ago
I have the same issue on my Chrysler 300 limited. I called the dealership, I am out of warranty and they don't cover the interior trim anyway. They suggested I call Chrysler directly and open a case

which I did. Chrysler called me back today and said it is not covered and I would have to pay for the replacement myself. I told them that was Bull, it is a 3 year old car and this should not be happening. In reading all of the previous threads, it looks like it is a known issue which makes me even madder. Perhaps all of us experiencing this and I'm sure there are a lot more out there that aren't posting, should consider a class action against Chrysler. I bought American and thought this was a good car and a good brand. I will not buy another Chrysler product.

10 mo ago
I have a 2016 Chrysler 300c bought it brand new and this started happening a few days ago I paid almost 5k for the maxi care unlimited warranty and now was just told that basically that warranty is worthless. It doesn't cover something that is clearly a manufacturing issue whats even more irritating is that there is no where that I can find that says is does or doesn't cover door panels there is almost no info on the interior stuff that the extended warranties cover. My dealership said the bill will be close to 9k to get those door panels fixed and I have a co-worker with a 2017 300c and his doors are doing the exact same thing!!!

9 mo ago
Just got a call from my dealership that there is nothing that Chrysler is willing to do to help me. Whats even more frustrating is that my case worker Cody didn't even call me no email no nothing just a call from the dealership saying they won't help. No explanation no reason nothing. All my phone calls to Chrysler care goes to voicemail so I guess I have to resort to just telling my story in these forums and social media in hopes that other people looking to have dealings with Chrysler is aware that this problem exists and is not just something we are making up. So I bought my car 3 years ago as a present to myself after 21 years in the military my wife actually gave me the green light to buy any car I wanted within reason lol but yes any car I wanted brand new. So I decided on a 300c platinum I just loved the way the car felt and how it looks just everything about it. I ended up buying one of the most expensive 300 on the dealership lot with all the extended warranties, the tire care package, the scotch guard protection and the life time unlimited mile maxi-care warranties. I did this so that I can have piece of mind that if something goes wrong at least in the

next 3-5 years or so it wouldn't cost me an arm and leg to get it fixed. Yes I understand that trim and seals and tires and all that stuff are wear items and cosmetic things but its also reasonable to believe that if one of those things go bad I could get it replaced fairly easy. I have had no major issues with my car in the last 3 years and I take great care of it my windows are tinted I park in a garage most of the time and yes I do live in Florida it is hot but to have this problem after 3 years is a bit ridiculous. I have a 14 year old armada, a mazda, a fiat and a 200 and none of those are having any issue like this. It just amazes me that a 3 year car with all these upgrades and warranties will have a 10 thousand dollar manufacturer\supplier defect (this is definitely a defect) and we as customers have no protection no recourse nothing just to eat it. And if I buy said 10 thousand dollar door panels no one is willing to guarantee them for more than a few months to a year I cant get a 5 year or more warranty on them to give myself piece of mind it wont happen again. I am sorry for ranting I do love the car the way it drives and all that but there is no way shape or form that anyone should have to deal with a problem like this. And the customer care service couldn't even call me and talk to me directly so that seems to be poor customer service. Anyway all I am sorry that we are all having to deal with this apparently no course of action can be taken but I will be putting my story out as much as I can.

2 mo ago

I bought a used 2017 Chrysler 300c in 2018 with 42000 miles, so it was already out of warranty. My front passenger door panel was already starting to eliminate at that time. I took the car to an upholstery shop and was told they could not repair the problem. I was advised to buy a new panel. I put up with the look of the panel for two years and over that time the panel became much worse. I took my car to Scott Robinson Chrysler Dodge Jeep in Torrance, Ca to get it fixed. The service advisor told me it is a known defect but my car is out of warranty and Chrysler will not help. I too have an after market warranty, but it will not cover this repair. My car is currently in the shop getting repaired to the tune of about $500. This is my 2nd Chrysler 300c.

27 d ago

I am experiencing the door panel separation with my 2016 300 C, all 4 of my doors, It stands to reason if there are so many with the same

problem there is a defect in the door panel structure or the clips they used to hold it in place. I think Chrysler should stand behind the faulty design and replace the part of panel that is defective and include another 5 year warranty on the panels since it seems to be an on going issue... I called my dealer and asked if the nano Tek stuff had anything to do with the panels since it was sprayed everywhere but he said no... so it is a defect issue. I am placing a call to Chrysler also, I have been loyal to the Brand for almost 30 years and never had a problem like this one.

See https://www.300cforums.com/threads/2016-chrysler-300-door-panels.277838/.

35.     CarComplaints.com fields complaints regarding various makes and models.  Here are a few of the recent complaints as to the Dodge Charger:

**Charger RT 5.7L Hemi**
41,000 miles
I bought car at a Chevy place (big mistake when you are buying a Dodge.) Went back to them showed them what was going on. They couldn't help me past warranty. Went to the Dodge place 10 miles away and the only thing they would do was order me new ones and I pay for them. But per them they would be on back order. So this is telling me Dodge is having a problem with them. My driver side is really bad and passenger side is starting to get worse. I feel Dodge should replace these as it's a malfunction on their part. My brother who is a body shop guy looked at it and he said there was no way to fix it, needed to be replaced as you couldn't glue it or use tacks. His boss said same thing and they work for a Dodge body shop. So are we supposed to have paid nice money for a car we love and have the doors screwed up & it's not due to anything we did?

**Charger RT 5.7L**
72,000 miles
Due to mileage neither the dealer or Dodge customer service volunteer to assist. Three years and the interior door panels start to separate!! There is no recall on this problem but clearly it is common. It's all over the internet how can Dodge ignore this? This is pitiful workmanship and horrible customer service!

**Charger LX**
16,632 miles
Door panels warped on my 2016 Dodge Charger on both the driver side front and rear doors. I can believe this happened to a fairly new vehicle. Any suggestions on how to get it fixed or if Dodge can help?

**Charger LX**
16,632 miles
At the time of the problem, I had only owned the car for about 1 year and 6 months. Outrageous how the dealer wants me to pay around $2200 for both the front panels + the installation for a car that is still considered new. My other vehicles that are 18 years old does not even have these kind of problem with the door panels.

*See*                 https://www.carcomplaints.com/Dodge/Charger/2016/accessories-interior/door_panels_are_warping.shtml.

36.     The National Highway Traffic Safety Administration ("NHTSA") has also fielded many complaints.  They are categorized by make, model, and year. Here are a few of the recent complaints as to the 2016 Dodge Charger:

August 14, 2020 **NHTSA ID NUMBER: 11349324**
**Components: STRUCTURE**
**NHTSA ID Number:** 11349324

**Incident Date** November 1, 2018

**Consumer Location** ABILENE, TX

**Vehicle Identification Number** 2C3CDXCT5GH****

**Summary of Complaint**

TL* THE CONTACT OWNS A 2016 DODGE CHARGER. THE CONTACT STATED THAT ALL FOUR DOORS PANEL STARTED TO DETACH FROM THE DOOR FRAME. THE CONTACT STATED THE DAMAGE TO THE FRONT PASSENGER, FRONT DRIVER AND REAR PASSENGER DOORS WERE SEVERELY DAMAGED AND THE REAR

DRIVER DOOR RECENTLY STARTED TO BECOME DETACHED. THE CONTACT TOOK THE VEHICLE TO STAR DODGE CHRYSLER JEEP RAM (5101 S 1ST ST, ABILENE, TX 79605) WHERE THEY REFERRED HIM TO THE MANUFACTURER. THE CONTACT HAD YET TO SPEAK TO THE MANUFACTURER ABOUT THE FAILURE. THE VEHICLE HAD YET TO BE REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 30,000.

August 12, 2020 **NHTSA ID NUMBER: 11348883**
**Components: STRUCTURE**
**NHTSA ID Number:** 11348883

**Incident Date** March 15, 2020

**Consumer Location** GULF BREEZE, FL

**Vehicle Identification Number** 2C3CDXL96GH****

**Summary of Complaint**

TL* THE CONTACT OWNS A 2016 DODGE CHARGER. THE CONTACT STATED THAT THE GLUE ON THE DOOR PANEL AND CENTER CONSOLE SEPARATED. THE CONTACT CALLED THE HILL-KELLY DODGE CHRYSLER JEEP RAM DEALER LOCATED AT 6171 PENSACOLA BLVD, PENSACOLA, FL 32505, AND WAS TOLD THAT THE VEHICLE WAS OUT OF WARRANTY. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND STATED THAT THE WARRANTY EXPIRED. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 15,000.

July 31, 2020 **NHTSA ID NUMBER: 11342509**
**Components: STRUCTURE**
**NHTSA ID Number:** 11342509

**Incident Date** March 22, 2018

**Consumer Location** ANTIOCH, TN

**Vehicle Identification Number** 2C3CDXCT0GH****

**Summary of Complaint**

TL* THE CONTACT OWNS A 2016 DODGE CHARGER. THE CONTACT STATED THAT THE DOOR PANEL DETACHED FROM THE DOOR FRAME. THE CONTACT STATED THAT THE WIRES INSIDE OF THE DOOR PANEL WERE EXPOSED. ADDITIONALLY, THE CONSOLE NEAR THE GEAR SHIFT LEVER WAS ALSO SEPARATED. THE VEHICLE WAS TAKEN TO ROCKIE WILLIAMS PREMIER DODGE CHRYSLER JEEP RAM (600 PLEASANT GROVE RD, MT. JULIET, TN 37122) TO BE DIAGNOSED. THE CONTACT WAS INFORMED THAT THE DOOR PANEL NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND PROVIDED A CASE NUMBER. THE FAILURE MILEAGE WAS 109,423.


July 9, 2020 **NHTSA ID NUMBER: 11338487**
**Components: STRUCTURE**
**NHTSA ID Number:** 11338487

**Incident Date** June 9, 2020

**Consumer Location** JACKSON, GA

**Vehicle Identification Number** 2C3CDXCT5GH****

**Summary of Complaint**

TL* THE CONTACT OWNS A 2016 DODGE CHARGER. THE CONTACT STATED THAT THE INSIDE DOOR PANELS ON THE FRONT AND REAR PASSENGER'S SIDE OF THE VEHICLE DETACHED FROM THE DOOR FRAMES. CRONIC CHRYSLER DODGE JEEP RAM LOCATED AT (2515 N EXPY, GRIFFIN, GA 30223; (770) 227-4271) WAS CONTACTED AND INFORMED OF THE FAILURE. THE VEHICLE WAS NOT TAKEN TO BE INSPECTED NOR REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 50,000.

July 8, 2020 **NHTSA ID NUMBER: 11338133**
**Components: STRUCTURE**
**NHTSA ID Number:** 11338133
**Incident Date** June 17, 2020

**Consumer Location** CAMILLA, GA

**Vehicle Identification Number** 2C3CDXBG2GH****

**Summary of Complaint**

TL* THE CONTACT OWNS A 2016 DODGE CHARGER. THE
CONTACT STATED THAT THE DOOR PANELS ON THE
FRONT DRIVER'S AND PASSENGER'S DOORS WERE
DETACHED FROM THE DOOR FRAME. THE VEHICLE WAS
NOT TAKEN TO A DEALER OR INDEPENDENT MECHANIC
TO BE DIAGNOSED NOR REPAIRED. THE MANUFACTURER
WAS NOT MADE AWARE OF THE FAILURE. THE
APPROXIMATE FAILURE MILEAGE WAS 42,000.

July 1, 2020 **NHTSA ID NUMBER: 11331948**

**Components: STRUCTURE**
**NHTSA ID Number:** 11331948

**Incident Date** June 1, 2020

**Consumer Location** NEWTON, GA

**Vehicle Identification Number** 2C3CDXBG6GH****

**Summary of Complaint**

TL THE CONTACT OWNS A 2016 DODGE CHARGER. THE
CONTACT STATED THAT THE DOOR PANELS ON BOTH THE
FRONT DRIVER AND PASSENGER SIDE DETACHED FROM
THE DOOR FRAMES. THE VEHICLE WAS NOT TAKEN TO BE
INSPECTED NOT REPAIRED. NEITHER THE DEALER NOR
THE MANUFACTURER WERE NOTIFIED OF THE FAILURE.
THE FAILURE MILEAGE WAS UNKNOWN.

https://www.nhtsa.gov/vehicle/2016/DODGE/CHARGER/4%252520DR/RWD.

NHTSA has also received numerous complaints about the Defect from Chrysler 300 owners during the relevant period, including these recent examples:

August 24, 2020 **NHTSA ID NUMBER: 11350852**
**Components: STRUCTURE**
**NHTSA ID Number:** 11350852

**Incident Date** August 1, 2019

**Consumer Location** BROOKLYN, NY

**Vehicle Identification Number** 2C3CCAEG6GH****

**Summary of Complaint**

TL- THE CONTACT OWNS A 2016 CHRYSLER 300. THE CONTACT STATED THAT OVER TIME THE DOOR PANEL HAD UPLIFTED AND SEPERATEDE FROM THE DOOR FRAME CAUSING THE LOCKING MECHANISM TO MALFUNCTION ON OCCASIONS. THE FAILURE HAD AFFECTED BOTH THE FRONT DRIVER AND PASSENGER SIDE DOOR. THE CAUSE OF THE FAILURE WAS NOT DETERMINED. THE LOCAL DEALER AND MANUFACTURER WERE NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 4,000. JFT

July 30, 2020 **NHTSA ID NUMBER: 11342316**
**Components: STRUCTURE**
**NHTSA ID Number:** 11342316

**Incident Date** July 1, 2016

**Consumer Location** MIAMI, FL

**Vehicle Identification Number** 2C3CCABTXFH****

**Summary of Complaint**

TL* THE CONTACT OWNS A 2015 CHRYSLER 300. THE CONTACT STATED THAT AN UNKNOWN INSIDE DOOR PANEL DETACHED FROM THE DOOR FRAME. THE VEHICLE WAS TAKEN TO PLANET DODGE CHRYSLER JEEP RAM (9975

32

NW 12TH ST, MIAMI, FL 33172) WHO REFERRED THE CONTACT TO THE MANUFACTURER FOR ASSISTANCE. THE MANUFACTURER WAS INFORMED OF THE FAILURE BUT DECLINED TO COVER THE REPAIR. THE VEHICLE WAS NOT REPAIRED. THE APPROXIMATE FAILURE MILEAGE WAS 35,000.

July 13, 2020 **NHTSA ID NUMBER: 11339042**
**Components: STRUCTURE**
**NHTSA ID Number:** 11339042

**Incident Date** July 1, 2020

**Consumer Location** EATON, OH

**Vehicle Identification Number** 2C3CCAKG6GH****

**Summary of Complaint**

THE INSIDE FRONT PASSENGER SIDE DOOR PANEL IS LIFTING UP AWAY FROM THE WINDOW. THIS CAR IS GARAGE KEPT AND I HAVE BEEN WORKING FROM HOME SINCE MARCH 23, 2020 SO IT HAS NOT BEEN LEFT OUT IN THE SUN. THE INTERIOR VINYL IS PULLING AWAY AND SEPARATING FROM THE BODY. THIS HAPPENED WHEN STATIONARY AND IS GETTING INCREASINGLY WORSE.

June 29, 2020 **NHTSA ID NUMBER: 11331464**
**Components: STRUCTURE**
**NHTSA ID Number:** 11331464

**Incident Date** June 8, 2020

**Consumer Location** HUMBLE, TX

**Vehicle Identification Number** 2C3CCABG2HH****

**Summary of Complaint**

TL* THE CONTACT OWNS A 2017 CHRYSLER 300. THE CONTACT STATED THE DRIVER'S SIDE REAR AND PASSENGER SIDE FRONT DOOR PANEL WERE DETACHED FROM THE DOOR FRAME. THE VEHICLE WAS TAKEN TO

33

TEXAN DODGE CHRYSLER JEEP RAM 18555 EASTEX FWY, HUMBLE, TX 77338 (281) 973-3844, TO BE DIAGNOSED. THE CONTACT WAS INFORMED THAT THE DOOR PANEL NEEDED TO BE REPLACED DUE TO HEAT. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT CONTACTED. THE FAILURE MILEAGE WAS 25,000.

April 28, 2020 **NHTSA ID NUMBER: 11322597**
**Components: STRUCTURE**
**NHTSA ID Number:** 11322597

**Incident Date** April 24, 2020

**Consumer Location** TALLAHASSEE, FL

**Vehicle Identification Number** 2C3CCAEG1HH****

**Summary of Complaint**

MY DOOR PANELS ARE WARPING MY CAR IS 3 YEARS OLD AND IS EXTREMELY TOO SOON TO BE EXPERIENCING THIS KIND OF DAMAGE. IF FOR WHATEVER REASON IT CAUSES DAMAGE TO MY AIRBAGS IT'S PUTTING ME AND MY CHILD AT RISK OF SERIOUS INJURY.

September 8, 2019 **NHTSA ID NUMBER: 11253989**
**Components: UNKNOWN OR OTHER**
**NHTSA ID Number:** 11253989

**Incident Date** August 1, 2019

**Consumer Location** HEMET, CA

**Vehicle Identification Number** 2C3CCAEG3JH****

**Summary of Complaint**

SIDE PANELS ON ARE ALL FOUR DOORS ARE LIFTING

37.   This is only a smattering of the comments and complaints from some of the online complaint boards and NHTSA website about the Defect.  And, of course, those who took the time to go online and comment are just the tip of the

iceberg.  There can be no question that the scope of this problem is massive. Hundreds of thousands of car owners have been victimized by Defendant.  It is further obvious from the huge volume of online complaints that Defendant was well aware of the Defect before Plaintiffs – and the vast majority of the members of the proposed class – purchased their vehicles.

38.    Upon information and belief, Defendant knowingly marketed and sold/leased the Subject Vehicles with the Defect, while willfully concealing the true inferior quality and substandard performance of the vehicles.

39.    Defendant directly markets the Subject Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media.

40.    Defendant's marketing materials and advertisements describe the Subject Vehicles as premium cars, with attractive styling, that are well-built, safe, and reliable.

41.    In reality, the Subject Vehicles are not well-built and are not manufactured to remain attractive, safe, or reliable as Defendant's marketing suggests.  Defendant concealed the fact that the Subject Vehicles do not remain attractive, safe, or reliable under ordinary conditions because the Defect will, through no fault of the car owner, ruin the appearance of the vehicle and result in a variety of safety and systems problems.

42.    Plaintiffs and the members of the proposed class were exposed to Defendant's long-term, national, multimedia marketing campaign touting the supposed quality, safety, and comfort of the Subject Vehicles, and justifiably made their decisions to purchase or lease their Subject Vehicles based on Defendant's misleading marketing that concealed the true, defective nature of the Subject Vehicles.

43.    Further, Defendant knowingly misled Plaintiffs and members of the proposed class about the true, defective nature of the Subject Vehicles.  As detailed above, Defendant has been aware of the Defect since at least 2015, and certainly well before Plaintiffs and most class members purchased or leased their vehicles. Defendant was aware of the Defect from pre-release evaluation and testing; investigations based on reports from authorized service departments; the high number of repairs and replacement parts that were sold by Defendant and its affiliates; and the numerous and consistent complaints about the Defect made directly to Defendant, collected by NHTSA, and posted in public online forums.

44.    In sum, Defendant has actively concealed the existence and nature of the Defect from Plaintiffs and the proposed class since at least 2015 despite its knowledge of the existence and pervasiveness of the Defect.   Specifically, Defendant has:

a. Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Subject Vehicles, including the Defect;

b. Failed to disclose, at and after the time of purchase, lease, and/or service, that the Subject Vehicles' interior trim panels were defective and not fit for their intended purposes;

c. Failed to disclose, and actively concealed, the fact that the Subject Vehicles' interior panels were defective, despite the fact that Defendant learned of the Defect by 2015 at the latest, and certainly well before Plaintiffs and most class members purchased or leased their cars;

d. Failed to disclose, and actively concealed, the existence and pervasiveness of the Defect even when directly asked about it by customers during communications with Defendant, Defendant's dealerships and service centers, and Defendant's corporate affiliate Mopar;

e. Actively concealed the Defect by making in-warranty temporary "fixes" knowing full well that the Defect will manifest again, though outside of the warranty period; and

f. Actively concealed the Defect by consistently patching the panel failures with temporary "fixes," so that the Defect is not permanently corrected, even though car owners were led to believe that the Defect had been fully and permanently repaired.  By engaging in the conduct described above, Defendant has concealed the Defect from Plaintiffs and the members of the proposed class.  If potential buyers or lessors of Subject Vehicles had possessed knowledge of the information Defendant concealed, they would not have purchased or leased the Subject Vehicles or would have paid less to do so.

45.    Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Defendant responsible for disseminating false and misleading marketing materials regarding the Subject Vehicles.  Defendant necessarily is in possession of all of this information.  Plaintiffs' claims arise out of Defendant's fraudulent concealment of the Defect, and its representations about the quality, safety, and comfort of the Subject Vehicles.  To the extent that Plaintiffs' claims arise from Defendant's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including specifically at the time they purchased or leased their cars, Defendant knew, or was reckless in not knowing, of

the Defect; Defendant was under a duty to disclose the Defect based upon its exclusive knowledge of it, and its concealment of it; and it never disclosed the Defect to Plaintiffs or the public at any time or place or in any manner.

46.    Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Defendant:

a. ***Who***: Defendant actively concealed the Defect from Plaintiffs and the members of the proposed class while simultaneously touting the safety, comfort, sophistication, and quality of the Subject Vehicles, as alleged above.  Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Defendant responsible for such decisions.

b. ***What***: Defendant knew, or was reckless or negligent in not knowing, that the Subject Vehicles contain the Defect, as alleged above. Defendant concealed the Defect and made representations about the safety, comfort, sophistication, quality, and other attributes of the Subject Vehicles, as specified above.

c. ***When***: Defendant concealed material information regarding the Defect at all times and made representations about the quality, safety, and comfort of the Subject Vehicles, starting no later than 2015,

continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day, as alleged above.  And when consumers brought their vehicles to Defendant complaining of the Defect, Defendant denied any knowledge of or responsibility for the Defect.

d. *Where*: Defendant concealed material information regarding the true nature of the Defect in every communication it had with Plaintiffs and the members of the proposed class and made representations about the quality, safety, and comfort of the Subject Vehicles.  Plaintiffs are aware of no document, communication, or other place or thing, in which Defendant disclosed the truth about the Defect to anyone outside of Defendant.  Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendant's website.

e. *How*: Defendant concealed the Defect from Plaintiffs and members of the proposed class and made representations about the quality, safety, and comfort of the Subject Vehicles.  Defendant actively concealed the truth about the existence and nature of the Defect from Plaintiffs and the proposed class at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable consumer, and Defendant promised in its

marketing materials that the Subject Vehicles have qualities that they do not have.

f. *Why*: Defendant actively concealed material information about the Defect in the Subject Vehicles for the purpose of inducing Plaintiffs and the members of the proposed class to purchase and/or lease Subject Vehicles, rather than purchasing or leasing competitors' vehicles, and to reduce the number and cost of repairs that would be required pursuant to Defendant's warranties and implied warranties. Defendant misrepresented the quality, safety, and comfort of the Subject Vehicles. Had Defendant disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs and the class would have been aware of it and would not have bought or leased the Subject Vehicles or would have paid less for them. Moreover, they would have demanded full, complete, and permanent repairs while under warranty.

### Plaintiff Johnson's Experience

47. Mrs. Johnson is a 65-year old retiree living in Palmdale, California. She worked for the state of California before retiring to spend more time caring for her ill daughter and working for her church in several capacities, including as minister, bereavement director, and bible college registrar.

48.    In April of 2019, Mrs. Johnson bought her 2016 Chrysler 300C.  The car had relatively low miles and looked immaculate.  Mrs. Johnson appreciated the car's styling and performance.

49.    In February of 2020, the interior panel of Mrs. Johnson's driver's side front door lifted up.  She initially thought this problem was the result of vandalism, such as a "slim jim" being inserted between the window and the door panel.  She even filed a police report.  When she took the car to Enterprise Car Sales, where she purchased the vehicle, however, she was told that the Defect was commonplace in 300s.

50.    The Enterprise service department informed her that she was outside of her Enterprise-warranty period.  Nevertheless, Mrs. Johnson was able to convince Enterprise to pay for the repair of the panel as a one-time courtesy.

51.    Two weeks later, however, all four of her door panels – including the one recently repaired – began to rise up and separate from the frame.  Photos of Mrs. Johnson's vehicle from the Spring of 2020 have been attached hereto as Exhibit 2.

52.    Mrs. Johnson knew she could not obtain a repair from Enterprise so she called her insurance company.  She held a policy of comprehensive automobile insurance from Infinity Insurance.  She filed a claim and sent photos.  She was told

to take the vehicle to the local Chrysler dealership, which was Hunter Dodge, Chrysler, Jeep, and Ram in Lancaster, California.

53.    Mrs. Johnson dropped off her vehicle.  The service department at the dealership confirmed that this issue was common on 300s.  The dealership provided an estimate to fix all four door panels.  The total amount was thousands of dollars.  The insurance adjuster informed Mrs. Johnson that Infinity Insurance had determined that the interior panels were not a covered item and refused to pay for the repairs.

54.    Mrs. Johnson then called the Chrysler national customer service line to request that the Defect be repaired.  She spoke with Defendant's customer service department and was informed that Defendant would not repair the vehicle. She asked to speak to a supervisor or someone in the legal department but was told that she would not be allowed to do so.

55.    Mrs. Johnson could not afford to complete the repairs so she retrieved her car and has not made the repairs.

56.    She has lodged complaints online and with the NHTSA.

57.    One of Mrs. Johnson's online complaints read as follows:

I have a 2016 300c and all 4 of the door panels have lifted. My car was vandalized and it appeared that the drivers door was opened with a Slim Jim. The drivers door panel was lifted up. It was repaired at a body shop a week later. Upon picking my vehicle back, the repair shop showed me that the other door panels were also lifting. I didn't have the money to have those repaired so I took my car home, only to

43

have the drivers door panel lift again. Now all 4 panels are lifted. And just like others have stated the dealership in my area (Palmdale, CA), said that my warranty has expired and that I would cost me about $1200 per door. I can't afford this, I tried to glue one down with gorilla glue but was unsuccessful. This is crazy because I was told that this is a known problem with these cars and now I am seeing that others have the same problem. How do I contact Chrysler about this known manufacturer problem? My car doors look horrible, and I am embarrassed to even drive my car. I actually loved my car (except for it using a lot of gas), I have only owned it for 1 year. I am a single senior and I need help in getting these panels replaced/repaired. This on top of the coronavirus pandemic is not what I need. HELP PLEASE.

Her complaint with the NHTSA reads as follows:

August 16, 2020 **NHTSA ID NUMBER: 11349678**
**Components: STRUCTURE**
**NHTSA ID Number:** 11349678

**Incident Date** April 25, 2020

**Consumer Location** PALMDALE, CA

**Vehicle Identification Number** 2C3CCAEG6GH****

**Summary of Complaint**

INTERIOR DOOR PANELS ARE WARPED AND LIFTED. I COMPLAINED TO CHRYSLER ALONG WITH MANY OTHERS, AND MY COMPLAINT WAS DENIED TWICE. THIS MANUFACTURING DEFECT CAUSES TEMPERATURE INSIDE MY VEHICLE TO BE COMPROMISED DUE TO THE LACK OF INSULATION.

58.    The extent of the problem has further degraded on all four doors.

The door panels have lifted even further exposing open airways to the interior of the door.  During the summer months, hot air streams up from the interior door cavity directly into the vehicle interior.  This makes the car's interior temperature

difficult to regulate. As a result, Mrs. Johnson is not able to transport her daughter to medical appointments in the 300.

59.   Mrs. Johnson drives her 300 as little as possible. Not only is the car unsightly and depressing for her to see, but the interior temperature is difficult to regulate without insulation from the cavity in the doors. She does not feel safe driving the vehicle because the Defect has increased the risk of theft or break-in. Further, the Defect is likely to make the side air bags malfunction.

60.   Mrs. Johnson has spent dozens of hours dealing with the Defect. She has also spent money visiting the repair shop and dealership. Her time and expenses have been wasted; she has nothing to show for it. She has suffered anxiety and stress as a result of the unrepaired Defect.

61.   Mrs. Johnson hopes that through this lawsuit Defendant will agree to repair her vehicle and those of all other victims of the Defect. She also hopes that she and all other victims will be compensated for the losses they have suffered due to the Defect.

### Plaintiff Player's Experience

62.   Mr. Player lives in El Paso, Texas with his wife and children. He works as a manufacturers' representative.

63.   In December of 2015, Mr. Player bought his 2016 Dodge Charger. He loved the car's looks and its performance.

64.    In 2018, while he was still under his original warranty period, the Defect began to manifest on both front doors. He took the car to the dealership and the repairs were made without any charge to Mr. Player. The repair turned out to be a temporary fix only, however, and did not even extend to the entirety of the Defect but only to the front door panels.

65.    In 2020, the Defect reappeared. First, the front door panels (the same panels that should have been fixed in or about 2018) rose up and separated from the door frame. Mr. Player returned to the dealership and requested that the panels be repaired. He was informed that – since he was outside of the warranty period – he would have to pay for the repairs. Mr. Player stated that this was obviously a manufacturing defect – he has owned numerous cars over the years but has never seen this issue arise in any other vehicle – and demanded the Defendant cover the repair. Mr. Player's dealership assured him that there was nothing they could do, rather it was a corporate decision by Defendant.

66.    Mr. Player researched the Defect and found hundreds of online complaints. He confirmed that it was not just his dealership, but that Defendant has established the nationwide policy that it does not repair the Defect outside of the initial warranty period. Thus far, Mr. Player has refused to pay for the repair.

67.    Since returning from the dealership, the Defect has manifested in two additional areas. One of his rear door panels has now begun to rise up. Further,

his front dash has begun to pull away from the front windshield.  Photos of the current state of Mr. Player's Charger have been attached hereto as Exhibit 3.

68.    Mr. Player is outraged that Defendant refuses to take responsibility for what is obviously a manufacturer's defect.  Not only is the car unsightly and depressing to view, but the Defect causes safety issues that make Mr. Player reluctant to drive his family members in the car, including: the Defect is likely to make the side air bags malfunction; there is an increased risk of theft or break-in; and the interior temperature is difficult to regulate without insulation from the cavity in the doors.  Mr. Player has spent many hours dealing with the Defect and has spent money visiting the dealership.  His time and expenses have been wasted; he has nothing to show for it.  He has suffered anxiety and stress as a result of the unrepaired Defect.  Mr. Player is reluctant to pay for the repairs himself and hopes that this lawsuit will result in Defendant agreeing to repair the Defect.  Further, Mr. Player believes that victims of the Defect should be reimbursed for all of their out-of-pocket expenses.

**Plaintiff Vensky's Experience**

69.    Mr. Vensky lives in Warrenton, Oregon with his wife.  He is a retired engineer.

70.    Mr. Vensky purchased a used 2016 Dodge Charger R/T from an authorized Chrysler dealer known as Dick's Country Dodge in Hillsboro, Oregon. He was drawn to the car by its styling and performance.

71.    In 2020, Mr. Vensky began to notice the Defect manifesting on both front doors.

72.    In September 2020, Mr. Vensky contacted the closest Chrysler dealership – Lum's Auto Center in Warrenton, Oregon – notified them of the problem and asked them to fix it.

73.    Lum's service manager Nate Whisnant informed Mr. Vensky that the factory warranty had expired, the extended service contract he purchased through Dick's Country Dodge did not cover the door panels, and there were no technical service bulletins, warranty enhancements, or recalls under which the repair would be covered.

74.    Mr. Whisnant quoted Mr. Vensky a price of $477.52 to repair the front doors.  Mr. Whisnant also noted that both door panel assemblies were on national backorder with no current estimated time of arrival, thus the Defect could not likely be repaired anytime soon.  Clearly, as experienced by other Plaintiffs and victims, the manifestation of the Defect has become so common that Defendant and its affiliate Mopar cannot make the parts fast enough to keep up with their failure.

75.    Mr. Vensky is not in a position to pay nearly $500 to fix the Defect, especially since his Internet research led him to conclude Defendant's "fix" is only a temporary fix.  Mr. Vensky was particularly disinclined to pay Defendant and its affiliates to repair, even temporarily, a very common problem that Defendant has known about for years.  Nor did Mr. Vensky desire to wait an indeterminate amount of time to fix the Defect, given its unsightly nature and potential safety concerns.

76.    Mr. Vensky studied various do-it-yourself descriptions on the Internet.  He then purchased needed materials and, relying on his engineering background, took the door panels apart and scraped away all of the adhesive behind the vinyl that had failed.  The adhesive had essentially turned to dust.  He then reattached the door panels and "super glued" them down, holding them in place with custom frames until the glue dried.  Although this is merely a temporary "band aid" and the problem will eventually reoccur, it will enable Mr. Vensky to drive the vehicle with less fear of safety problems or embarrassment regarding the unsightly Defect until it can be permanently fixed.

77.    Mr. Vensky has expended dozens of hours and spent money addressing the Defect.  He has suffered anxiety and stress as a result of the Defect. He hopes that this lawsuit will result in Defendant agreeing to repair the Defect.

Further, Mr. Vensky believes that victims of the Defect should be reimbursed for all of their out-of-pocket expenses and/or losses.

### Plaintiff Wartelle's Experience

78.    Mr. Wartelle lives in Folsom, Louisiana with his wife and is an attorney.

79.    Mr. Wartelle purchased his used 2017 Chrysler 300C in or about April of 2018.  The car had approximately 28,000 miles on it.  He appreciated the vehicle's impressive appearance.   Mr. Wartelle has since driven the car an additional 55,000 miles, exceeding his factory warranty limit.

80.    Approximately three months ago, Mr. Wartelle noticed the panel on the driver's side front door had begun to pull away from the frame.  Over the next few months, the Defect became progressively worse and the panel began to pull further and further away from the frame.   Additionally, the Defect began to manifest on the passenger's side front door panel and both read door panels, which also began to warp and pull away from the frame.  Photos of the current state of Mr. Wartelle's Charger have been attached hereto as Exhibit 4.

81.    Mr. Wartelle researched this issue online and discovered hundreds, if not thousands, of nearly identical complaints concerning the Defect on various chat and message boards from 300 and Charger owners.  Mr. Wartelle also discovered that Defendant has refused to acknowledge the problem and has forced

owners from all over the country who are outside of their factory warranty period to pay to have the Defect repaired.

82.    Because he is not under warranty, Mr. Wartelle realized that he would have to pay to have the Defect fixed.  Mr. Wartelle researched the cost of fixing the Defect on all doors and found that it would cost hundreds of dollars and that the door assembly parts are on backorder and not even available.

83.    Mr. Wartelle does not believe it is equitable to force him or other vehicle owners to pay to repair an issue that is clearly a manufacturing defect that Defendant has known about for years.  As a result, Mr. Wartelle is left to drive a vehicle that is unsightly, embarrassing, and poses potential safety risks, such as air bag malfunction.

84.    Mr. Wartelle has spent time and suffered anxiety and stress as a result of the unrepaired Defect.  Mr. Wartelle is reluctant to pay for the repairs himself and hopes that this lawsuit will result in Defendant agreeing to repair the Defect. Further, Mr. Wartelle believes that victims of the Defect should be reimbursed for all of their out-of-pocket expenses and/or losses.

## **Class Action Allegations**

85.     Pursuant to Federal Rule 23, Plaintiffs bring this action on behalf of

themselves and a class initially defined as:

> All United States persons or entities who (i) currently own or lease or
> previously owned or leased a Subject Vehicle and who paid out of
> pocket to repair the Defect; (ii) currently own or lease a Subject
> Vehicle but have not yet repaired the Defect; or (iii) previously owned
> or leased a Subject Vehicle and who sold or surrendered the Subject
> Vehicle.

86.     Plaintiff Johnson also seeks to represent a subclass of California

victims of the Defect defined as follows:

> All citizens of California who meet the class definition.

Plaintiff Player also seeks to represent a subclass of Texas victims of the

Defect defined as follows:

> All citizens of Texas who meet the class definition.

Plaintiff Vensky also seeks to represent a subclass of Oregon victims of the

Defect defined as follows:

> All citizens of Oregon who meet the class definition.

Plaintiff Wartelle also seeks to represent a subclass of Louisiana victims of

the Defect defined as follows:

> All citizens of Louisiana who meet the class definition.

87.     Excluded from the class (and subclasses) are:

a. Defendant and any entity in which Defendant has a controlling interest, and their legal representatives, employees, officers, directors, assigns, parents, affiliates, and successors;

b. The judge, magistrate, and any special master to whom this case is assigned, and any member of their immediate families; and

c. To the extent the class certification order permits exclusion, all persons who timely submit proper requests for exclusion from the class.

88.   The class consists of all current owners and most prior owners of a Subject Vehicle.  The Subject Vehicles were sold to at least 800,000 customers nationwide, thus making individual joinder impracticable pursuant to Fed. R. Civ. P. 23(a)(1).  The disposition of the claims in a single class action will provide substantial benefits to all parties and to the Court, including the just, speedy, and inexpensive determination of this matter.  The class consists of hundreds of thousands of members across the nation, and the warranty at issue provided by Defendant to its customers is substantively identical with respect to each class member.  Moreover, the members of the class are readily identifiable through the records and transaction data kept by Defendant.

89.   Plaintiffs' claims are both typical and aligned with the claims of the proposed class.  The damages sustained by Plaintiffs are also typical of those

sustained by class members.  The factual and legal bases of the claims are common to all plaintiff class members and represent a common injury.  *See* Fed. R. Civ. P. 23(a)(2).

90.    There are many common questions of law and fact.  These common issues include, but are not limited to:

> a. when the Defect became known to Defendant;
>
> b. what warranty terms apply to the Defect; and
>
> c. what steps to correct the Defect were taken and when.

These and other common questions of law and fact predominate over individual questions and a class action is the superior means to litigate the claims.  *See* Fed. R. Civ. P. 23(b)(3).

91.    There is a well-defined community of interest in the questions of law and fact involved in this matter such that a class action is clearly the superior method for the fair and efficient handling of this dispute.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of potentially hundreds of thousands of owners of Subject Vehicles is impracticable.  The damages suffered by individual class members are relatively small on an individual basis, making the acquisition of counsel to represent a class member on an individual basis cost prohibitive, especially when taking into consideration the sophistication and resources of

Defendant.  The expense and burden of litigation would make it difficult, if not impossible, under these circumstances for the members of the class to individually redress the wrongs done to them by Defendant.  However, because of the commonality of the predominant issues involved in the class claims, defenses, and damages alleged, there will be no difficulty in maintaining this dispute as a class action.

92.     Plaintiffs will fairly and adequately represent and protect the interests of the class as required by Fed. R. Civ. P. 23(a)(4).  The named Plaintiffs own Chrysler 300s and Dodge Chargers and are thus typical of the class members as required by Fed. R. Civ. P. 23(a)(3).  Plaintiffs have retained competent counsel with experience in class action litigation.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class and have the financial resources to do so.  Neither Plaintiffs nor their counsel have any interests that are contrary to or adverse to those of the class that Plaintiffs seek to represent.

93.     Certification is also appropriate under Fed. R. Civ. P. 23(b)(2) in that Defendant acted or refused to act on grounds that apply generally to the class, thus warranting injunctive or declaratory relief.  Defendant should be required to implement an appropriate, concrete, and timely warranty protocol for its defective interior panels.

94.    Alternatively, should the Court find that Plaintiffs cannot meet the requirements of Fed. R. Civ. P. 23(b)(2) or 23(b)(3), the Court should certify liability issues that are susceptible to class-wide proof.

95.    The precise liability issues Plaintiffs would seek to alternatively certify will be set forth more fully in their forthcoming motion for class certification; however, those predominant liability issues will necessarily relate to whether Defendant has breached its warranty with its customers.

## FIRST CAUSE OF ACTION
### Breach of Express Warranty

96.    Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein verbatim.

97.    At all times, Defendant is and has been engaged in the business of designing, manufacturing, distributing, marketing, and selling Chrysler and Dodge vehicles throughout the United States.

98.    At all times, Defendant is and has been a merchant and seller of the Subject Vehicles.

99.    Defendant expressly warranted to Plaintiffs and the members of the class that the Subject Vehicles were merchantable and fit for their ordinary, particular, and intended use and purpose.

100.    Defendant breached its express warranties.  The Subject Vehicles sold by Defendant to Plaintiffs and the members of the class were not in

merchantable condition, were not fit for the ordinary purpose for which cars are used, and/or were not of the same quality as those generally acceptable in the trade.  In fact, the Subject Vehicles were defective from the point of manufacture and sale, thus rendering the product unmerchantable at the time of purchase.

101.   Defendant has breached its express warranties by failing to adequately provide coverage to repair or correct the interior panel defects, leaving hundreds of thousands of customers without a remedy.  Even in instances where Defendant paid to repair the Subject Vehicles during the warranty period, the repair was a "temporary fix" which did not correct the design defect at issue. Rather than spend the amount necessary to meet its obligations, Defendant chose to save money on repairs by making only a superficial repair that was destined to later fail again.  Furthermore, Defendant was aware that the Defect was present in at least six interior panel areas (each of the four doors, the central console, and the dash).  As a known defect, each of these areas should have been repaired pursuant the Defendant's express warranty obligations.  Even under warranty, Defendant only temporarily patched those instances of the Defect that were manifesting at that time.

102.   Plaintiffs are also entitled to claim breach under Defendant's express warranty to authorized sellers of the Subject Vehicles.  Plaintiffs and class members have had sufficient direct dealings with either the Defendant or its

agents (dealerships, service departments, and Mopar) to establish vertical privity of contract between themselves and Defendant.

103.   Notwithstanding this, privity is not required in this case because Plaintiffs and class members are intended third-party beneficiaries of contracts between Defendant and their dealers; specifically, they are the intended beneficiaries of Defendant's warranties.  The dealers were not intended to be the ultimate consumers of the Subject Vehicles and have no rights under the warranty agreements provided with the Subject Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

104.   Plaintiffs took reasonable steps to notify Defendant within a reasonable time that their defective vehicle was not as represented by contacting their authorized Chrysler or Dodge dealership and its authorized service department.  Defendant received actual notice of the defect because Plaintiffs contacted a local authorized dealer and/or service department for repairs and Defendant has failed to repair the vehicles.

105.   As a direct and proximate result of Defendant's breaches, Plaintiffs and the members of the proposed class have suffered harm and monetary loss. The failure of Defendant to repair the Subject Vehicles has caused harm to Plaintiffs and the class members.

## SECOND CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability

106.   Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein verbatim.

107.   Defendant is and was at all relevant times a merchant with respect to motor vehicles.

108.   Plaintiff Player purchased the defective vehicle from Defendant's authorized agent, his local dealership.  At the time of purchase, Defendant and its authorized agents were in the business of leasing and selling vehicles and by course of business held themselves out as having special knowledge or skill regarding these vehicles.  Plaintiff Johnson purchased her defective vehicle from Enterprise Car Sales which had purchased the car directly from Defendant. Plaintiffs Vensky and Wartelle purchased their used cars from authorized dealers of Defendant.  At the time of these purchases, Defendant and its authorized agents were in the business of leasing and selling vehicles and by course of business held themselves out as having special knowledge or skill regarding these vehicles.

109.   A warranty that the Subject Vehicles were in merchantable condition was implied by law.

110.   The Subject Vehicles, when sold and at all times thereafter, were not in merchantable condition and were not fit for the ordinary purpose for which cars are used and/or were not of the same quality as those generally acceptable in the

trade. In fact, the Subject Vehicles, including the 2016 Chrysler 300 and 2016 Dodge Charger (and prior and later years of each model), were defective from the point of manufacture and sale, thus rendering the product unmerchantable at the time of purchase. Specifically, the Subject Vehicles were designed, manufactured, distributed, and sold with defective interior panels that Defendant knew were defective and likely to prematurely degrade.

111.  Plaintiffs are also entitled to claim breach under Defendant's implied warranty to authorized sellers of the Subject Vehicles. Plaintiffs and the class members have had sufficient direct dealings with either Defendant or its agents (dealerships) to establish vertical privity of contract between themselves and Defendant.

112.  Notwithstanding this, privity is not required in this case because Plaintiffs and the class members are intended third-party beneficiaries of contracts between Defendant and its dealers; specifically, they are the intended beneficiaries of Defendant's warranties. The dealers were not intended to be the ultimate consumers of the Subject Vehicles and have no rights under the warranty agreements provided with the Subject Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

113.  Plaintiffs took reasonable steps to notify Defendant within a reasonable time that their defective vehicle was not as represented by contacting

their authorized dealer and/or service department. Plaintiffs were not required to provide notice of the defect in any other manner but, in any event, Defendant received actual notice of the defect because Plaintiffs contacted a local authorized dealer for repairs and Defendant has failed to repair the vehicle.

114. As a direct and proximate result of Defendant's breaches, the Plaintiffs and the members of the class have suffered harm and monetary loss. Defendant's practice of selling the Subject Vehicles, which did not have the expected quality, is a substantial factor in causing harm to Plaintiffs and the class members.

**THIRD CAUSE OF ACTION**
**Violation of the Magnuson-Moss Warranty Act**
**15 U.S.C. §§ 2301, *et seq*.**

115. Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein verbatim.

116. This Court has jurisdiction to decide claims brought under 15 U.S.C. §§ 2301, *et seq.* by virtue of 28 U.S.C. § 1332(a)-(d).

117. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

118. Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 (4)-(5).

119.    The Subject Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

120.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

121.    Defendant's express warranty is a warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).    The Subject Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

122.    Defendant breached its warranty by failing to repair the Subject Vehicles' interior panels, by providing Subject Vehicles not in merchantable condition and not fit for the ordinary purpose for which vehicles are used, and by failing to cure defects and nonconformities once they were identified.

123.    If necessary, Plaintiffs and the members of the proposed class have had sufficient direct dealings with Defendant or its agents (dealerships, service departments, and Mopar) to establish privity of contract.

124.    Notwithstanding this, privity is not required in this case because Plaintiffs and class members are intended third-party beneficiaries of contracts between Defendant and its dealers; specifically, they are the intended beneficiaries of Defendant's warranties.    The dealers were not intended to be the ultimate consumers of the Subject Vehicles and have no rights under the warranty

agreements provided with the Subject Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

125.   Plaintiffs fully satisfied any obligations under 15 U.S.C. § 2310(a)(3) and also provided Defendant with opportunities to cure, even though no such opportunity is required in these circumstances.   Thousands of complaints over several years have not been sufficient to make Defendant do the right thing.

126.   Requiring an informal dispute settlement procedure, or affording Defendant a reasonable opportunity to cure its breach of written warranties, would be unnecessary and futile.   At the time of sale or lease of each Subject Vehicle, Defendant knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Subject Vehicles' inability to perform as warranted.   Defendant has, nonetheless, failed to rectify the situation or implement an adequate remedy.   Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement – whether under the Magnuson-Moss Warranty Act or otherwise – that Plaintiffs resort to an informal dispute resolution procedure or afford Defendant a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

127.   Plaintiffs and the class members would suffer economic hardship if they returned their Subject Vehicles but did not receive the return of all payments made by them.   Because Defendant is refusing to acknowledge any revocation of

acceptance and return immediately any payments made, Plaintiffs and the members of the class have not reaccepted the Subject Vehicles by retaining them.

128. The repair of just one interior panel usually costs several hundred dollars. Thus, the amount in controversy in each Plaintiff's individual claim exceeds $1000. Each of the Subject Vehicles has at least six defective interior panels. The total amount in controversy in this action is many millions of dollars, computed on the basis of all claims to be determined in this lawsuit. The number of class members is likely to exceed 800,000 and the amount in controversy (to be determined by all claims in this action) far exceeds $50,000. 15 U.S.C. §§ 2310(d)(3)(B)-(C).

129. Plaintiffs seek all damages in an amount to be proven at trial. Alternatively, Plaintiffs seek to revoke acceptance of the Subject Vehicles.

## FOURTH CAUSE OF ACTION
### Fraud by Concealment

130. Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein verbatim.

131. Plaintiffs bring this cause of action for themselves and on behalf of all members of the proposed class and proposed California, Texas, Oregon, and Louisiana subclasses.

132. Defendant had a duty to disclose the Defect because a seller must:

a. disclose enough information to prevent its statements from being misleading;

b. disclose any condition or defect that it knows or should know about that renders the product defective or dangerous; and

c. disclose basic, material information if it knows that the buyer is about to act without knowledge of the information and is without reasonable means to acquire the information itself.

133. Defendant concealed and suppressed material facts concerning the serious Defect causing the Subject Vehicles to degrade into unattractive and unsafe cars totally failing to meet basic standards. The Defect is hidden and all relevant components are located within interior cavities not visible to the naked eye. Defendant knew that Plaintiffs and the class members would not be able to inspect or otherwise detect the Defect prior to purchasing or leasing their vehicles. Furthermore, Defendant was aware that, even after the Subject Vehicles were purportedly repaired during the warranty period, car owners would not be able to discern that the repair was a temporary and partial fix and that the Defect had not actually been repaired.

134. Defendant did so in order to boost confidence in its vehicles and falsely assure purchasers and lessees that the Subject Vehicles were top-of-the-line cars that were comfortable, safe, warranted, and reliable. Defendant

concealed the accurate information in order to prevent harm to Defendant and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Subject Vehicles prior to their purchase or lease.

135.   These omissions were material to consumers, both because they concerned the quality of the Subject Vehicles and because the omissions played a significant role in the decisions to purchase or lease the Subject Vehicles.

136.   Defendant further failed to disclose and/or denied the existence the Defect when Plaintiffs and members of the proposed class complained.   As a result, class members were misled as to the true condition of their vehicles once at the time of purchase or lease and again when they complained to Defendant.

137.   Plaintiffs and the members of the proposed class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased their Subject Vehicles or would have paid less for them.  The actions of Plaintiffs and the other victims were justified.   Defendant was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or members of the proposed class.

138.   Because of the concealment and/or suppression of the facts, Plaintiffs and the members of the proposed class sustained damages because they negotiated and paid value for the Subject Vehicles not factoring in the Defect that Defendant

failed to disclose. Moreover, they paid Defendant and/or its affiliates for parts and repair work which was equally defective.

**FIFTH CAUSE OF ACTION**
**Violation of Song-Beverly Consumer Warranty Act**
**Breach of Implied Warranty**
**Cal. Civ. Code §§ 1790, *et seq.***

139. Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein verbatim.

140. Plaintiff Johnson brings this cause of action for herself and on behalf of all members of the proposed California subclass.

141. Plaintiff Johnson and other members of the proposed California subclass who purchased Subject Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

142. The Subject Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

143. Defendant is a "manufacturer" of Subject Vehicles within the meaning of Cal. Civ. Code § 1791(j).

144. Defendant impliedly warranted to Plaintiff Johnson and other members of the proposed California subclass that the Subject Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Subject Vehicles do not have the quality that a buyer would reasonably expect.

145.   Cal.   Civ.   Code   §   1791.1(a)   states:   "Implied   warranty   of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following: (1) Pass without objection in the trade under the contract description; (2) Are fit for the ordinary purposes for which such goods are used; (3) Are adequately contained, packaged, and labeled; and (4) Conform to the promises or affirmations of fact made on the container or label.

146.   The   Subject   Vehicles   would   not   pass   without   objection   in   the automotive trade because they share a common design and/or manufacturing defect in that they are equipped with defective interior trim panels which peel away from the adjacent surface of the vehicle frame, and related defects, exposing occupants to   potential   safety   and   security   risks.   The   Defect   leads   to   an   unsightly   and unattractive appearance that is grossly substandard in the marketplace.

147.   Because of the Defect, Subject Vehicles are not safe to drive and thus nor fit for ordinary purposes.

148.   Subject Vehicles are not adequately labeled because the labeling fails to disclose the Defect.

149.   In the various channels of information through which Defendant sold Subject Vehicles, Defendant failed to disclose material information concerning the Defective Vehicles which it had a duty to disclose.   Defendant had a duty to disclose   the   Defect   because,   as   detailed   above:   (a)   Defendant   knew   of   the

defective interior trim panels and the safety and security risks the Defect raised; (b) Defendant had exclusive knowledge of material facts not known to the general public, Plaintiff Johnson, or other members of the proposed California subclass; (c) Defendant actively concealed material facts concerning the Defect from the general public, Plaintiff Johnson, and other members of the proposed California subclass.  As detailed above, the information concerning the Defect was known to Defendant at the time of advertising and selling the Subject Vehicles, all of which was intended to induce consumers to purchase the Subject Vehicles.

150.    Defendant breached the implied warranty of merchantability by manufacturing and selling Subject Vehicles that are defective.  Furthermore, the Defect has caused Plaintiff Johnson and other members of the proposed California subclass to not receive the benefit of their bargain and has caused the Subject Vehicles to depreciate in value.

151.    As a direct and proximate cause of Defendant's breach of the implied warranty of merchantability, Plaintiff Johnson and other members of the proposed California subclass received goods whose dangerous condition substantially impairs their value.

152.    Plaintiff Johnson and other members of the proposed California subclass have been damaged as a result of the diminished value of Defendant's products.

153.   Under Cal. Civ. Code §§1791.1(d) & 1794, Plaintiff Johnson and other members of the proposed California subclass are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Subject Vehicles, or the overpayment or diminution in value of their Subject Vehicles.

154.   Pursuant to Cal. Civ. Code §1794, Plaintiff Johnson and other members of the proposed California subclass are entitled to costs and attorneys' fees.

**SIXTH CAUSE OF ACTION**
**Violation of Song-Beverly Consumer Warranty Act**
**Breach of Express Warranty**
**Cal. Civ. Code §§ 1790, *et seq*.**

155.   Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein verbatim.

156.   Plaintiff Johnson brings this cause of action for herself and on behalf of all members of the proposed California subclass.

157.   Plaintiff Johnson and other members of the proposed California subclass who purchased Subject Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

158.   The Subject Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

159.   Defendant is a "manufacturer" of Subject Vehicles within the meaning of Cal. Civ. Code § 1791(j).

160.   Plaintiff Johnson and other members of the proposed California subclass bought or leased new motor vehicles manufactured by Defendant.

161.   Defendant made express warranties to Plaintiff Johnson and other members of the proposed California subclass within the meaning of Cal. Civ. Code §§ 1791.2 & 1793.2, as described above.

162.   As set forth above in detail, the Subject Vehicles are inherently defective in that in that they are equipped with defective interior trim panels which peel away from the adjacent surface of the vehicle frame, and related defects, exposing occupants to potential safety and security risks and a vehicle of substandard appearance, which substantially impairs the use, value, and safety of the Subject Vehicles to reasonable consumers.

163.   As a result of Defendant's breach of their express warranties, Plaintiff Johnson and other members of the proposed California subclass received goods whose dangerous condition substantially impairs their value to Plaintiff Johnson and other members of the proposed California subclass.  Plaintiff Johnson and other members of the proposed California subclass have been damaged as a result of, inter alia, the diminished value of Defendant's products, the products' malfunctioning, and the nonuse of their Subject Vehicles.

164.    Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiff Johnson and other members of the proposed California subclass are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Subject Vehicles, or the overpayment or diminution in value of their Subject Vehicles.

165.    Under Cal. Civ. Code § 1794, Plaintiff Johnson and other members of the proposed California subclass are entitled to costs and attorneys' fees.

**SEVENTH CAUSE OF ACTION**
**Violation of Business and Professions Code § 17500**
**(Untrue or Misleading Representations)**

166.    Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein verbatim.

167.    Plaintiff Johnson brings this cause of action for herself and on behalf of all members of the proposed California subclass.

168.    From a date unknown to Plaintiff and continuing to the present, Defendant has engaged in and continues to engage in, has aided and abetted and continues to aid and abet, and has conspired to and continues to conspire to engage in acts or practices that constitute violations of Business and Professions Code § 17500, *et seq.*, by making or causing to be made untrue or misleading statements with the intent to induce members of the public to purchase the Subject Vehicles

and to complete repairs of the Subject Vehicles which are not true repairs but rather only temporary fixes that are bound to fail.

169.   Defendant's untrue or misleading representations to the subclass include, but are not limited to, oral affirmative misrepresentations and omissions to Plaintiff Johnson and members of the subclass that the Subject Vehicles are well-made, safe, and reliable.   Defendant continues to deny that the Defect is a manufacturer's defect which it is obligated to repair.   The affirmative written and oral misrepresentations made to Mrs. Johnson and upon which she relied are set forth above.

170.   At all relevant times, Defendant knew or by the exercise of reasonable care should have known that its representations were untrue or misleading.   Since at least 2015 – and likely sooner – Defendant has known that the Defect exists in the Subject Vehicles, yet it has continued to deny the existence of the Defect, to market, sell, and lease Subject Vehicles without acknowledging the Defect, and to purport to repair Subject Vehicles without actually repairing the Defect.

171.   As a result of Defendant's untrue or misleading representations and omissions, Plaintiff and the members of the subclass are entitled to an order, pursuant to Business and Professions Code § 17535, enjoining such future conduct by Defendant and such other orders and judgments that may be necessary to provide restitutionary disgorgement of Defendant's ill-gotten gains and to restore

to any subclass member all monies paid as a result of Defendant's false or misleading statements.

## EIGHTH CAUSE OF ACTION
### Violations of Business and Professions Code § 17200
### (Unfair Competition)

172.   Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein verbatim.

173.   Plaintiff Johnson brings this cause of action for herself and on behalf of all members of the proposed California subclass.

174.   Defendant has engaged in and continues to engage in, has aided and abetted and continues to aid and abet, and has conspired to and continues to conspire to engage in business acts or practices that constitute unfair competition as defined in the Unfair Competition Law, Business and Professions Code § 17200 *et seq.*, in that such business acts and practices are unlawful, unfair, and fraudulent within the meaning of that statute.

175.   The business acts and practices engaged in by Defendant that violate the Unfair Competition Law include:

a. Providing Plaintiff and members of the subclass with untrue, misleading, unreliable, and/or inaccurate information concerning the Subject Vehicles and the Defect; and

b. Omitting material facts concerning the Defect and Defendant's intention to fully repair the Defect during the warranty period.

176. These business acts and practices are unlawful because they violate laws including Business and Professions Code § 17500 and the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, both as set forth above.

177. These business acts and practices are unfair in that Defendant has caused buyers and lessees of the Subject Vehicles to pay tens of thousands of dollars and often to undertake sizable debt obligations for cars that they would never accept if they were told the truth: the interior panels will become deformed and, even if repaired during the warranty period, the fix is only temporary and owners will eventually have to spend thousands of dollars or endure an ugly and unsafe vehicle. These acts and practices violate public policy and are also immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.

178. These business acts and practices are fraudulent in that Defendant's untrue and misleading representations and omissions regarding the Defect, Subject Vehicles, and repair work are likely to, and in fact have, deceived the public.

179. As a result of Defendant's unlawful, unfair, and fraudulent business acts and practices, Plaintiff Johnson and the members of the subclass are entitled to an order, pursuant to Business and Professions Code § 17203, enjoining such

future conduct by Defendant and such other orders and judgments that may be necessary to provide restitutionary disgorgement of Defendant's ill-gotten gains and to restore to subclass members all monies paid as a result of Defendant's conduct.

## NINTH CAUSE OF ACTION
### Violations of California Consumer Legal Remedies Act

180.  Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein verbatim.

181.  Plaintiff Johnson brings this cause of action for herself and on behalf of all members of the proposed California subclass.

182.  Defendant has engaged in and continues to engage in, has aided and abetted and continues to aid and abet, and has conspired to and continues to conspire to engage in practices that violate the Consumer Legal Remedies Act, Civil Code §§ 1750, *et seq.* ("CLRA"), specifically unfair, deceptive, unlawful, and unconscionable commercial practices in connection with the sale of services to consumers.

183.  Plaintiff Johnson and the members of the subclass are "consumers" as defined by Civil Code § 1761(d).  Vehicles and repair services are "goods" and "services" as defined by Civil Code § 1761.

184.  The practices engaged in by Defendant that violate the Consumer Legal Remedies Act include:

a. Providing Plaintiff Johnson and members of the subclass with untrue, misleading, unreliable, and/or inaccurate information concerning the Subject Vehicles and Defect; and

b. Omitting material facts concerning the Subject Vehicles and the Defect, including that repairs to correct the Defect were only temporary fixes.

*See, e.g.*, Civil Code §§ 1770(a)(2)-(3), (5), (7), (9), (14).

185.   In failing to disclose the Defect in the Subject Vehicles, Defendant concealed material facts and knowingly and intentionally breached its duty not to do so.  The facts concealed or not disclosed by Defendant to Plaintiff and members of the proposed subclass were material in that a reasonable consumer would have considered them important in deciding whether to purchase a Subject Vehicle or pay a lesser price.  Had Plaintiff and members of the proposed California subclass known of the Defect in the Subject Vehicles, they would not have purchased the Subject Vehicles or would have paid less for them.

186.   The injuries suffered by Plaintiff and the members of the proposed California subclass were proximately caused by Defendant's fraudulent and deceptive business practices.

187. Plaintiff and the members of the proposed California subclass are entitled to injunctive relief.  At this time, Plaintiff and the members of the proposed California subclass do not seek damages under this cause of action.

188. Pursuant to Civil Code § 1782(a), Plaintiff Johnson has provided notice to Defendant in writing via certified mail, return receipt requested, to Defendant's principal place of business, of the alleged violations of § 1770 of the CLRA.  In that letter, Plaintiff demanded that Defendant rectify the improper actions described above by providing monetary relief and non-monetary relief, by agreeing to be bound by its legal obligations, and by giving notice to all affected customers of its intent to do so.  If, within 30 days of the date of this written notice, Defendants fail to provide appropriate relief for their violation of the CLRA, Plaintiff will amend this Complaint to seek monetary, compensatory, and punitive damages and any other relief permitted by § 1780 of the CLRA, in addition to the injunctive relief now being sought under the CLRA.

## TENTH CAUSE OF ACTION
### Violation of the Deceptive Trade Practices Act
### Tex. Bus. & Com. Code §§ 17.41, *et seq.*

189. Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein verbatim.

190. Plaintiff Player brings this cause of action for himself and on behalf of all members of the proposed Texas subclass.

191.   Plaintiff Player and the members of the proposed Texas subclass are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets).  *See* Tex. Bus. & Com. Code § 17.41.

192. The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."  Tex. Bus. & Com. Code § 17.45(5); Tex. Bus. & Com. Code § 17.50(a)(3).  Defendant has committed false, misleading, unconscionable, and deceptive acts or practices in the conduct of trade or commerce.

193.   Plaintiff Player and other members of the proposed Texas subclass were deceived by Defendant's failure to disclose that the Subject Vehicles share a uniform Defect, as described in detail above, in that they include defective interior trim panels which have a propensity to peel away from the adjacent surface of the vehicle frame, creating potential safety and security risks as well as cosmetic problems.

194.   Defendant engaged in unlawful trade practices when, in the course of its business it, among other acts and practices, knowingly made materially incomplete representations as to the characteristics, uses and benefits of the Subject Vehicles.

195.   In the various channels of information through which Defendant marketed and sold Subject Vehicles, Defendant failed to disclose material information concerning the Subject Vehicles which it had a duty to disclose. Defendant had a duty to disclose the Defect because, as detailed above, (a) Defendant knew about the Defect in the interior trim panels and the safety and aesthetic concerns it raised; (b) Defendant had exclusive knowledge of material facts not known to the general public, Plaintiff Player, or other members of the proposed Texas subclass; and (c) Defendant actively concealed material facts concerning the Defect in the Subject Vehicles from the general public, Plaintiff Player, and the members of the proposed Texas subclass.  As detailed above, the information concerning the Defect was known to Defendant at the time of advertising and selling the Subject Vehicles, all of which was intended to induce consumers to purchase the Subject Vehicles.

196.   Defendant intended for Plaintiff Player and the other members of the proposed Texas subclass to rely on it to provide safe, adequately designed, and

adequately manufactured automobiles and to honestly and accurately reveal the problems described throughout this Complaint.

197. Defendant intentionally failed or refused to disclose the Defect to consumers.

198. Defendant's conduct and deceptive omissions were intended to induce Plaintiff Player and the other members of the proposed Texas subclass to believe that the Subject Vehicles were safe, adequately designed, and adequately manufactured automobiles.

199. Defendant's conduct constitutes unfair or deceptive business practices in violation of the Texas DTPA.

200. Plaintiff Player and the other members of the proposed Texas subclass have suffered injury in fact and actual damages resulting from Defendant's material omissions because they paid inflated purchase prices for the Subject Vehicles. Such vehicles would have been sold for less if Defendant had not withheld the material information about the Defect.

201. Defendant's conduct described herein is fraudulent, wanton, and malicious.

## ELEVENTH CAUSE OF ACTION
### Violation of the Unfair Trade Practices Act
### Or. Rev. Stat. §§ 646.605, *et seq.*

202.   Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein verbatim.

203.   Plaintiff Vensky brings this cause of action for himself and on behalf of all members of the proposed Oregon subclass.

204.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits the willful use or employment of a method, act, or practice declared unlawful under ORS § 646.608, including but not limited to representations that goods are of a particular standard, quality, or grade when in fact they are of another and general unfair or deceptive conduct in trade or commerce.  *Id.* at §§ 646.608(1)(g), (u).

205.   Defendant has violated the Oregon UTPA by, for example, willfully:

    a. Providing Plaintiff and members of the subclass with untrue, misleading, unreliable, and/or inaccurate information concerning the Subject Vehicles and the Defect; and

    b. Omitting material facts concerning the Defect and Defendant's intention to fully repair the Defect during the warranty period.

206.   Defendant's conduct and deceptive omissions were intended to induce Plaintiff Vensky and the other members of the proposed Oregon subclass to

believe that the Subject Vehicles were safe, adequately designed, and adequately manufactured automobiles.

207.  Plaintiff Vensky and the other members of the proposed Oregon subclass have suffered injury in fact and ascertainable damages proximately resulting from Defendant's material misrepresentations and omissions because they paid inflated purchase prices for the Subject Vehicles.  Such vehicles would have been sold for less if Defendant had not withheld the material information about the Defect.

208.  Defendant's conduct described herein is fraudulent, wanton, and malicious.

209.  Plaintiff Vensky and the other members of the proposed Oregon subclass are entitled to actual damages or statutory damages of $200, whichever is greater.  They are also entitled to punitive damages, attorneys' fees, and necessary and proper equitable relief.

210.  Plaintiff Vensky will provide notice to the Oregon Attorney General of this Class Action Complaint after filing.

**TWELFTH CAUSE OF ACTION**
**Unjust Enrichment**

211.  Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein verbatim.

212.   Plaintiffs bring this count on behalf of themselves, the proposed class, and the proposed California, Texas, Oregon, and Louisiana subclasses.

213.   Defendant benefited from selling and leasing, at an unjust profit, Subject Vehicles that had artificially inflated values due to Defendant's concealment of the Defect, and Plaintiffs and other members of the proposed class and subclasses overpaid for the Subject Vehicles.

214.   Defendant received and retained unjust benefits from the Plaintiffs and the other members of the proposed class and subclasses, and inequity has resulted.

215.   It is inequitable and unconscionable for Defendant to retain these benefits.

216.   Because Defendant concealed its fraud and deception, Plaintiffs and the other members of the proposed class and subclasses were not aware of the true facts concerning the Subject Vehicles and did not benefit from Defendant's misconduct.

217.   Defendant has knowingly accepted the unjust benefits of its fraudulent conduct.

218.   As a result of Defendant's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and the other members of the proposed class and subclasses, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray that the Court enter judgment against Defendant and in favor of the Plaintiffs and the proposed class to include:

A. Certification of the proposed class and subclasses under Fed. R. Civ. P. 23;

B. Appointment of Plaintiffs as class representatives;

C. Appointment of the undersigned attorneys as class counsel;

D. Finding that Defendant's conduct constitutes a breach of express and/or implied warranty;

E. Finding that Defendant's conduct constitutes a violation of the Magnuson-Moss Warranty Act;

F. Finding that Defendant fraudulently concealed the Defect;

G. Finding that Defendant violated California law;

H. Finding that Defendant violated Texas law;

I. Finding that Defendant violated Oregon law;

J. Finding that Defendant violated Louisiana law;

K. An award of injunctive relief;

L. An award of all applicable and appropriate damages, including compensatory damages, delay damages, statutory damages, and punitive damages;

M. An award of attorneys' fees; and

N. Such other and further judiciary determinations and relief as may be appropriate.

Dated: October 1, 2020          Respectfully submitted,

FINK BRESSACK

By:     */s/ David H. Fink_____*
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75185)
38500 Woodward Ave.
Suite 350
Bloomfield Hills, Michigan 48304
(248) 971-2500
dfink@finkbressack.com
dbressack@finkbressack.com
nfink@finkbressack.com

E. Adam Webb
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com

Tyler Hudson*
Eric D. Barton*
WAGSTAFF & CARTMELL LLP
4740 Grand Ave.
Suite 300
Kansas City, Missouri 64112
(816) 701-1100
thudson@wcllp.com
ebarton@wcllp.com

*Attorneys for Plaintiffs*

*Application for admission to be filed

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs, on behalf of themselves and the class and subclasses, hereby demand a trial by jury in the above entitled cause of action on all issues so triable.

FINK BRESSACK

By:     */s/ David H. Fink*_____
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75185)
38500 Woodward Ave., Suite 350
Bloomfield Hills, Michigan 48304
(248) 971-2500
dfink@finkbressack.com
dbressack@finkbressack.com
nfink@finkbressack.com

E. Adam Webb
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com

Tyler Hudson*
Eric D. Barton*
WAGSTAFF & CARTMELL LLP
4740 Grand Ave.
Suite 300
Kansas City, Missouri 64112
(816) 701-1100
thudson@wcllp.com
ebarton@wcllp.com

*Attorneys for Plaintiffs*

*Application for admission to be filed