UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DORTHEA JOHNSON, *et al.*,

      Plaintiffs,

v.

FCA US LLC,

      Defendant.

Case No. 20-cv-12690
Hon. Matthew F. Leitman

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (ECF No. 16)

In this putative class action, Plaintiffs bring a variety of statutory and common-law claims against Defendant FCA US LLC ("FCA") arising out of an alleged defect in the interior trim panels of their FCA vehicles. (*See* Am. Compl., ECF No. 14.)  FCA has now moved to dismiss Plaintiffs' claims. (*See* Mot. to Dismiss, ECF No. 16.)  For the reasons that follow, FCA's motion is **GRANTED IN PART AND DENIED IN PART**.

**I**

FCA was one of the world's leading automakers.  Plaintiffs are consumers who purchased 2014 model year and later "Chrysler 300s, Dodge Chargers, and Dodge Challengers sold in the United States" (the "Class Vehicles"). (Am. Compl. at ¶34, ECF No. 14, PageID.488.)  According to Plaintiffs, the Class Vehicles suffer

from an "inherent defect that results in interior trim panels (e.g., door panels, center console, dash console, kick panels) warping and pulling away from the vehicle frame" (the "Panel Defect"). (*Id.* at ¶1, PageID.479.)  Plaintiffs explain that "[t]he interior trim panels are bonded to the vehicle frame by an adhesive.  Over time, the attachment fails, causing the panels to pull away from the frame and warp, leaving a gap between the panel and the frame that exposes the 'guts' of the automobile, including airbags, wiring, controls, and electrical components." (*Id.* at ¶2, PageID.479.)

Plaintiffs claim that the Panel Defect causes two primary problems with the Class Vehicles.  First, Plaintiffs say that the Panel Defect "creates a condition that is embarrassing and unsightly to those that have purchased or leased these expensive, high end muscle cars and luxury vehicles." (*Id.* at ¶4, PageID.480.)  Second, Plaintiffs assert that the Panel Defect "raises serious safety concerns." (*Id.*)  More specifically, Plaintiffs allege that "the gap that results from the warping of the door panels allows moisture to enter harming the interior door components, including side air bags, door locks, anti-theft mechanisms, and heating/cooling systems. This can lead to malfunctioning electrical components, ruined air bags, and can (and has) made locking mechanisms malfunction, diminished the ability to regulate interior temperature, harmed visibility, and made the vehicles more susceptible to theft." (*Id.*)

Finally, Plaintiffs claim that even though FCA "has known about the [Panel] Defect for many years" (*id.* at ¶5, PageID.480), FCA has "actively concealed the [Panel] Defect from customers and continued to market the [Class] Vehicles in a manner that misrepresented the quality of the defective interior trim." (*Id.* at ¶39, PageID.490.)  Plaintiffs insist that "[h]ad [FCA] disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs and the class would have been aware of the [Panel] Defect and would not have bought or leased the [Class] Vehicles or would have paid less for them." (*Id.* at ¶95, PageID.531.)

## II

Plaintiffs filed their Amended Class Action Complaint, the operative pleading in this action, on January 22, 2021. (*See* Am. Compl., ECF No. 14.)  The named Plaintiffs are as follows:

- Dorthea Johnson, a California resident who "purchased a used 2016 model Chrysler 300C in California" in "early 2018." (*Id.* at ¶12, PageID.483.);

- Jason Player, a Texas resident who "purchased a new 2016 model Dodge Charger from an authorized Dodge dealer in Texas" in December 2015. (*Id.* at ¶13, PageID.483.);

- Tom Vensky, an Oregon resident who purchased "a used 2016 model Dodge Charger R/T from an authorized Dodge dealer in Oregon" at an unidentified time. (*Id.* at ¶14, PageID.483.);

- Charles Wartelle, a Louisiana resident who "purchased a used 2017 model Chrysler 300C in Louisiana" in April 2018. (*Id.* at ¶15, PageID.483.);

- Francisco Fernandez, a Florida resident who "purchased a new 2016 model Dodge Charger SRT Hellcat and a new 2016 model Dodge Challenger SRT Hellcat from authorized Dodge dealers in Florida" in or about July 2017. (*Id.* at ¶16, PageID.483-484.);

- Andrew Bennett, a North Carolina resident who "purchased a used 2017 model Dodge Charger in North Carolina" in or about August 2020. (*Id.* at ¶17, PageID.484.);

- Lois Miller, a North Carolina resident who "purchased a new 2016 model Chrysler 300 from an authorized Chrysler dealer in North Carolina" in April 2016. (*Id.* at ¶18, PageID.484); and

- Ryan Sturgill, a New Mexico resident who "purchased a new 2016 model Dodge Charger from an authorized Dodge dealer in New Mexico" in 2016. (*Id.* at ¶19, PageID.484.)

Plaintiffs bring claims against FCA for breach of express and implied warranties under state law and under the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*. (the "MMWA"), fraud, unjust enrichment, and violations of the consumer protection laws of various states.  They seek to represent a class of nationwide plaintiffs and individual state-specific sub-classes.

FCA first moved to dismiss Plaintiffs' claims on December 14, 2020. (*See* Initial Mot. to Dismiss, ECF No. 10.)  Rather than respond to that motion, Plaintiffs filed an Amended Complaint that sought to remedy the pleading deficiencies identified by FCA. (*See* Am. Compl., ECF No. 14.)  On February 23, 2021, FCA moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil

4

Procedure 12(b)(6). (*See* Mot. to Dismiss, ECF No. 16.)  The Court held a video hearing on the motion on July 20, 2021, and a second video hearing on August 6, 2021.

### III

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *See id*.  When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001).  Mere "conclusions," however, "are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.  A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

**IV**

FCA moves to dismiss Plaintiffs' claims on several different grounds. The Court will address each of FCA's bases for dismissal separately in the order that FCA presented them in its briefing.

**A**

FCA first argues that the Court should dismiss Plaintiffs' breach of express warranty, breach of implied warranty, MMWA, fraud, and unjust enrichment claims to the extent that Plaintiffs bring those claims on behalf of a nationwide class. (*See* Mot. to Dismiss, ECF No. 16, PageID.663-665.)  FCA contends that even though the named Plaintiffs have Article III standing to assert these claims on their own behalf, they "lack [Article III] standing to pursue claims on a nationwide basis [because] they do not plead a single fact which arguably connects any one of their vehicle purchases or injuries to any state other than" their home states.[1] (*Id.*, PageID.664.)

The United States Court of Appeals for the Sixth Circuit has not squarely decided whether a named plaintiff in a class action who has Article III standing to assert his own claims also has Article III standing to pursue claims on behalf of a nationwide class that arise under the laws of different states.  This is a difficult and

---

[1] FCA confirmed during the continued hearing on August 6, 2021, that it seeks to dismiss Plaintiffs' nationwide class claims based on a lack of Article III standing.

complicated question that has sharply divided courts in this district and across the country.  Some courts treat a named plaintiff's attempt to raise claims under the laws of different states as an Article III problem that must be resolved at the pleading stage; other courts view it as a matter going to the propriety of class certification under Federal Rule of Civil Procedure 23 that is properly resolved in connection with class certification proceedings. *See Withrow v. FCA US, LLC*, 2021 WL 2529847, at ** 6-8 (E.D. Mich. June 21, 2021) (acknowledging conflict and collecting cases).

To the Court's knowledge, two federal courts of appeal have both addressed this issue and reached the same conclusion: "as long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3), not a question of [standing] under Article III." *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 92 (2d Cir. 2018) (internal citation omitted). *See also Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) (explaining that fact that class members' claims may "rely on some other state's law … has nothing to do with standing.")  The Court finds the court's analysis in *Langan* particularly thorough and persuasive.  That court explained its ruling as follows:

The question in this case is whether there is a standing problem when a plaintiff attempts to sue on behalf of those who may have claims under different states' laws that generally prohibit the same conduct. Although we have not expressly resolved this question, we have previously assumed that this is an issue best addressed under Rule 23, rather than as a standing issue. *See In re Foodservice*, 729 F.3d at 112. For example, in *In re Foodservice*, we considered a consumer class action against a food distributor that, the plaintiffs alleged, fraudulently overbilled its customers. *See id.* The defendants appealed the district court's certification of the class, claiming that certification was improper because the class action implicated the distinct contract laws of multiple states. *See id.* at 126. We rejected that argument and affirmed the certification, reasoning that "putative class actions involving the laws of multiple states are often not properly certified *pursuant to Rule 23(b)(3)* because the variation in the legal issues to be addressed overwhelms the issues common to the class." *Id.* at 126–27 (emphasis added).

This approach of considering variations in state laws as questions of predominance under Rule 23(b)(3), rather than standing under Article III, makes sense. For one, it acknowledges the obvious truth that class actions necessarily involve plaintiffs litigating injuries that they themselves would not have standing to litigate. *See In re Bayer Corp.*, 701 F.Supp.2d at 377 ("Whether the named plaintiffs have standing to bring suit under each of the state laws alleged is 'immaterial' because they are not bringing those claims on their own behalf, but are only seeking to represent other, similarly situated consumers in those states."). Since class action plaintiffs are not required to have individual standing to press any of the claims belonging to their unnamed class members, it makes little sense to dismiss the state law claims of unnamed class members for want of standing when there was no requirement that the named plaintiffs have individual standing to bring those claims in the first place. *See id.*

8

This approach also accords with the Supreme Court's preference for dealing with modest variations between class members' claims as substantive questions, not jurisdictional ones. *See Gratz*, 539 U.S. at 266, 123 S.Ct. 2411 (explaining that differences in use of race between transfer- and freshman-admissions policies "clearly ha[d] no effect on petitioners' standing to challenge the [policies]" but "might be relevant to a narrow tailoring analysis"); *see also Lewis v. Casey*, 518 U.S. 343, 358 n.6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("The standing determination is quite separate from certification of the class.").

[….]

Accordingly, we conclude that whether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing under Article III.

*Langan*, 897 F.3d at 92-96 (emphasis in original; internal footnotes omitted).

*Langan* and *Morrison* appear to be consistent with the two most relevant decisions from the Sixth Circuit: *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998) and *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943 (6th Cir. 2011).

In *Fallick*, a plaintiff alleged that the defendant had "improperly denied benefits [due] to him and others" under the Employment Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 *et seq. Fallick*, 162 F.3d at 411-12. The plaintiff sought "injunctive, declaratory and other relief on behalf of himself and a purported class of beneficiaries and participants in ERISA

9

plans covering employees of entities which [were] not affiliated with [the defendant] but whose plans [were] administered or insured by [the defendant]." *Id.* at 412.  In district court, the defendant moved to dismiss the plaintiff's complaint for, among other things, "lack of standing." *Id.*  The district court granted the motion in part and held that the plaintiff "lacked standing under Article III of the U.S. Constitution to represent participants in benefit plans other than his own." *Id.*

On appeal, the Sixth Circuit had to "decide whether a potential class representative in an ERISA class action has standing to represent members of a putative class against numerous ERISA-governed benefit plans, even if he is only a member of one of those plans." *Id.* at 413.  The Sixth Circuit held that the named plaintiff did have such standing:

> Fallick seeks to certify and represent a class of all persons who are participants or beneficiaries of ERISA-regulated health insurance plans administered or insured by Nationwide and who, as of January 1, 1990, made a claim for health care benefits and were improperly denied reimbursement of medical expenses. In its Opinion and Order of September 30, 1996 ("Opinion and Order"), the district court held that Fallick lacked standing under Article III of the U.S. Constitution to represent participants in benefit plans other than his own. The district court's opinion warrants close scrutiny, as its analysis confuses the requirements of Article III and Rule 23 of the Federal Rules of Civil Procedure, which govern standing and the certification of class actions, respectively.
>
> [….]

10

The district court's analysis is fundamentally flawed in two important respects. First, conceptually, it confuses the issue of a plaintiff's standing under Article III vis-a-vis a defendant with the relationship between a potential class representative and absent class members, which is governed by Rule 23 of the Federal Rules of Civil Procedure. *See Goodman v. Lukens Steel Co.,* 777 F.2d 113 (3d Cir. 1985), *aff'd,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *Cooper v. University of Texas at Dallas,* 482 F.Supp. 187 (N.D.Tex. 1979), *aff'd,* 648 F.2d 1039 (5th Cir. 1981).

[....]

Threshold individual standing is a prerequisite for all actions, including class actions. *See O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). A potential class representative must demonstrate individual standing vis-as-vis the defendant; he cannot acquire such standing merely by virtue of bringing a class action. *See Brown v. Sibley,* 650 F.2d 760, 770 (5th Cir. 1981). As this Court has made clear, however, "once an individual has alleged a distinct and palpable injury to himself he has standing to challenge a practice even if the injury is of a sort shared by a large class of possible litigants." *Senter v. General Motors Corp.,* 532 F.2d 511, 517 (6th Cir. 1976). **Once his standing has been established, whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure**. *See Cooper v. University of Texas at Dallas,* 482 F.Supp. 187 (N.D.Tex.1979); HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 2.05 (3d ed.1992). **Thus, in the instant matter, once the district court correctly determined that Fallick had standing to bring suit under ERISA against Nationwide with respect to its application of reasonable and customary limitations to its determination of medical benefits—a**

> **methodology which, by Nationwide's own admission, it employs in all the benefits plans which Fallick wishes to include under the aegis of the proposed class—the court should then have analyzed whether Fallick satisfied the criteria of Rule 23 with respect to the absent class members.**
>
> [….]
>
> The foregoing analysis supports our conclusion that once a potential ERISA class representative establishes his individual standing to sue his own ERISA-governed plan, there is no additional constitutional standing requirement related to his suitability to represent the putative class of members of other plans to which he does not belong.

*Id.* at 421-24 (bold emphasis added; internal footnotes omitted).

While *Fallick* admittedly does not address the precise question of whether a named plaintiff may assert claims on behalf of a nationwide class under the laws of different states, it is nonetheless instructive. Indeed, there are important parallels between the claims that the named plaintiff in *Fallick* was attempting to assert on behalf of class members and the claims that the named Plaintiffs in this action are attempting to assert on behalf of the nationwide class members. In *Fallick*, the claims of the named plaintiff and the class members arose out of a uniform course of conduct (the defendant's method for calculating medical benefits), but the claims ultimately rested upon the assertion of different legal rights – *i.e.*, upon the breaches of different contracts. Similarly, in this action, the claims of the named Plaintiffs and the absent nationwide class members largely rest upon the same general alleged

course of conduct by FCA (*i.e.*, manufacturing and selling the Class Vehicles with the identical Panel Defect and then refusing to repair it), but the claims rest upon the assertion of different legal rights – *i.e.*, rights arising under the laws of the different states. *Fallick* suggests that Article III standing is not an issue under these circumstances and that, instead, the differences in the sources of the rights asserted by the named Plaintiffs and by the absent class members is an issue that affects class certification under Rule 23.

The Sixth Circuit's decision in *Pilgrim* is also instructive even though the court did not expressly address Article III questions. In *Pilgrim*, the plaintiffs "hop[ed] to represent a nationwide class of consumers" who were allegedly defrauded by a healthcare discount program. *Pilgrim*, 660 F.3d at 944. In the district court, the defendant "filed a motion to strike the class allegations" under Rule 23. *Id.* at 945. The defendant argued that class certification was impermissible under Rule 23 because (1) Ohio's choice-of-law rules (which governed the action) required the court to evaluate each class member's claim under the law of his or her home state and (2) the substantial differences between the relevant laws in the different states made a class action unmanageable and far outweighed any common features of the claims. *See id.* The district court granted the motion and struck the nationwide class allegations. *See id.*

The Sixth Circuit affirmed.  It agreed with the district court that a "class action in this setting [was] neither efficient nor workable nor above all consistent with the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.* at 944. Notably, however, the Sixth Circuit did *not* suggest that the named plaintiff *lacked Article III standing* to assert claims on behalf of the proposed class members on the ground that those claims would be governed by the substantively-distinct laws of different states.  And that seems significant.  Article III standing is an essential component of a federal court's subject matter jurisdiction, and the Sixth Circuit has repeatedly recognized its independent obligation to "verify the existence of [its] subject matter jurisdiction" as a "threshold matter" even where "the parties do not raise the issue of jurisdiction on appeal." *CDI Information Svcs., Inc. v. Reno*, 278 F.3d 616, 618 (6th Cir. 2002). *See also CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 489 (6th Cir. 2021) (explaining that "[s]tanding is necessary for a court's subject-matter jurisdiction, so the court has a duty to raise a standing defect (like any other jurisdictional defect) on its own initiative").  In discharging that duty, the Sixth Circuit has not hesitated to raise a party's lack of standing on its own initiative. *See*, *e.g.*, *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 922-23(6th Cir. 1988) (noting that defendant did "not raise the issue of whether [plaintiff] had Article III standing," nonetheless "reach[ing] the issue *sua sponte*," and concluding that plaintiff "lack[ed] article III standing to seek an injunction"); *United States v. Van*,

14

931 F.3d 384, (6th Cir. 1991) (dismissing appeal for lack of standing even though the standing "issue [was] not raised by the parties").[2]  Thus, it seems fair to conclude that the Sixth Circuit in *Pilgrim* discharged its duty to "verify" that it had subject matter jurisdiction to address the nationwide class claims and concluded that it did have such jurisdiction.  And in order to reach that conclusion, the Sixth Circuit necessarily had to satisfy itself that the plaintiff had Article III standing to raise the nationwide class claims before it.[3]  *Pilgrim* thus supports the conclusion – albeit indirectly – that whether a named plaintiff may assert claims on behalf of class members arising under the laws of different states is not an Article III standing question, but is instead a question to be addressed under Rule 23.

For all of these reasons, the Court declines to dismiss Plaintiffs' nationwide class claims for lack of Article III standing.

---

[2] *Cf. United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 342 n.5 (6th Cir. 2000) (explaining that "even if no party raises the propriety of a plaintiff's standing, we 'are under an independent obligation to examine [our] own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines,'" conducting standing inquiry *sua sponte* even though, "[o]n appeal, none of the parties raise[d] the threshold issue of whether the [plaintiffs] ha[d] standing," and concluding that plaintiffs did have standing) (quoting  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230–31(1990) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984))).

[3] Five years before *Pilgrim*, the Supreme Court made clear that a plaintiff must demonstrate Article III standing "for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  The Sixth Circuit in *Pilgrim* was surely well aware of that requirement when it chose to address the merits of whether the named plaintiff could assert claims on behalf of the nationwide class under Rule 23.

**B**

FCA next argues that the express warranty claims brought by Plaintiffs Player and Fernandez fail for several reasons.[4] (*See* Mot. to Dismiss, ECF No. 16, PageID.665-668.)  The Court disagrees.

**1**

FCA first argues that the applicable express warranty "does ***not*** cover the defect alleged." (*Id.*, PageID.665; emphasis in original.)  In relevant part, that warranty provides as follows:

> The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation. There is no list of covered parts since the only exception are tires and Unwired headphones. You pay nothing for these repairs. These warranty repairs or adjustments — including all parts and labor connected with them — will be made by your dealer at no charge, using new or remanufactured parts.

(Am. Compl. at ¶41, ECF No. 14, PageID.490-491.)  FCA says that this warranty does not cover design defects. (*See* Mot. to Dismiss, ECF No. 16, PageID.666-667.) FCA then insists that "the allegations in the [Amended Complaint] ***cannot*** plausibly be interpreted to support anything other than an alleged ***design*** defect." (*Id.*, PageID.666; emphasis in original.)

---

[4] Plaintiffs Player and Fernandez are the only named Plaintiffs to bring express warranty claims. (*See* Am. Compl. at Count 1.)

However, Player and Fernandez plausibly allege that the Panel Defect could arise from *either* a design defect *or* a defect in manufacturing and/or materials. For example, Player and Fernandez allege that the Panel Defect could "result[] from problems with the vehicles' design, [FCA's] workmanship or factory preparation, or materials (e.g., the panels themselves and/or the adhesive that bonds the trim panels to the frame). A determination of the [Panel] Defect's root cause and origin will be made after discovery, further factual development, and expert consultation." (Am. Compl. at ¶3, ECF No. 14, PageID.480.) At the motion to dismiss stage, "courts have rejected efforts to create an artificial distinction between design and materials/workmanship defects." *Persad v. Ford Motor Co.*, 2018 WL 3428690, at *5 (E.D. Mich. July 16, 2018). Because the facts Player and Fernandez allege here could be consistent with a defect in manufacturing or materials, they "are not required to commit to a single theory of the origin of the [Panel Defect] at this [early stage]." *Gregorio v. Ford Motor Company*, --- F.Supp.3d ---, 2021 WL 778913, at *15 (E.D. Mich. Mar. 1, 2021).

FCA counters that because Player and Fernandez allege that the Panel Defect exists in "*all* the [Class] Vehicles, *i.e.*, it is alleged to exist in tens of thousands of vehicles of varying models and model-years," then Player and Fernandez necessarily are pleading the existence of a design defect. (Mot. to Dismiss, ECF No. 16, PageID.666; emphasis in original). But "just because [Player and Fernandez] plead

allegations involving a class of vehicles does not preclude the possibility of a manufacturing defect." *Gregorio*, --- F.Supp.3d ---, 2021 WL 778913, at \*15. Indeed, it is "logically possible that either" the Panel Defect results from a flaw in the panel's design *or* that the panels "were all badly built, even though well-patterned." *Francis*, 504 F.Supp.3d at 673 (emphasis removed). Thus, where, as here, a party pleads "facts consistent with a defect that could be due to either poor design, or to poor materials and workmanship," the resolution of that question should "await development of the [factual] record." *Id.*[5]

Finally, Player and Fernandez plead that "[i]f the [Panel] Defect is advanced enough (i.e., if the panel has completely pulled away from the frame and warped), [FCA] approves a repair." (Am. Compl. at ¶7, ECF No. 14, PageID.481.)  It is reasonable to infer from this allegation that because FCA approved repairs of the Panel Defect, FCA believed that the defect was covered by the applicable written

---

[5] *See also In re FCA US LLC Monostable Electronic Gearshift Litigation*, 280 F.Supp.3d 975, 1011 (E.D. Mich. 2017) ("At this early stage of the case, without the benefit of any factual development as to the cause and origin of the alleged defect, dismissal of the express warranty claims is not justified by a premature and uninformed classification of the alleged defect as being categorically in the realm of 'design' or 'manufacturing'"); *Alin v. Am. Honda Motor Co.*, 2010 WL 1372308, at \*6 (D.N.J. Mar. 31, 2010) ("At the pleading stage, where the distinction between defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives").

warranty.[6]  That plausible inference further counsels against dismissing Player's or Fernandez' express warranty claim at the pleading stage.

For all of these reasons, the Court declines to dismiss Player's or Fernandez' express warranty claim on the basis that they plead only a design defect claim.

## 2

Second, FCA argues that the express warranty "was not breached." (Mot. to Dismiss, ECF No. 16, PageID.667.)  FCA says that Player and Fernandez do not plead a cognizable breach of the express warranty because "neither Player nor Fernandez plead they were denied a free repair during the warranty period." (*Id.*)  The Court declines to dismiss Player's or Fernandez' breach of express warranty claim on this basis.

With respect to Fernandez, he pleads that he purchased a new 2016 Dodge Charger SRT Hellcat and a new 2016 Dodge Challenger SRT Hellcat in or about July 2017. (*See* Am. Compl. at ¶157, ECF No. 14, PageID.547.)  "Toward the end of 2017, less than six months after purchasing his vehicles, Mr. Fernandez noticed that the front door panels on both the Charger and the Challenger had become spongy

---

[6] At the hearing on the motion to dismiss, FCA's counsel argued that there may have been several reasons why FCA may have approved free repairs of the Panel Defect even if FCA believed that the defect was not covered by the written warranty.  That may be true.  But the reasons why FCA approved a free repair are a matter for discovery.  At this stage, it is plausible that FCA approved repairs for the Panel Defect because FCA believed it was required to do so under the terms of the warranty.

and appeared to be lifting from the frame." (*Id.* at ¶160, PageID.549.) He then took his Charger to an authorized FCA dealership for a warranty repair. (*See id.* at ¶162, PageID.549.) The dealership took "photographs of all four door panels" and sent those pictures and a "description of the [Panel] Defect" to FCA "for approval of the warranty repairs." (*Id.* at ¶163, PageID.549.) FCA then "approved the warranty repairs." (*Id.* at ¶164, PageID.549.) However, because replacement door panels "were on national backorder," the dealership could not immediately repair Fernandez' Charger. (*Id.*, PageID.550.) Fernandez "stopped by the dealership at least once a month, and often multiple times a month, after the Charger repairs had been approved by [FCA] to ask if the parts were available and was repeatedly told they were not." (*Id.* at ¶169, PageID.551.) After waiting for "more than six months" for the door panels to become available – at which point his Challenger was also showing signs of the Panel Defect – Fernandez traded his vehicles back to his dealership for a loss. (*Id.* at ¶¶ 179-180, PageID.553-554.)

Under these circumstances, Fernandez plausibly alleges a breach of his express warranty. He plausibly contends, in effect, that FCA's express promise to repair his vehicle included a promise that the repair would be completed within a reasonable period of time, and he reasonably alleges that no repair was performed on his vehicles because FCA could not timely provide the required parts. FCA has not yet persuaded the Court that requiring Fernandez to wait more than six months

(and perhaps considerably longer) for a repair was reasonable.  The Court therefore declines to dismiss Fernandez' express warranty claim at this time. *Cf. In re FCA US LLC Monostable Electronic Gearshift Litigation*, 280 F.Supp.3d 975, 1010 (E.D. Mich. 2017) (declining to dismiss express warranty claim where "plaintiffs have alleged that the defendant failed or refused to repair" an allegedly defective part); *Gregorio*, --- F.Supp.3d ---, 2021 WL 778913, at *17 (declining to dismiss plaintiffs' express warranty claim where plaintiffs brought vehicle for repair and defendant was "either unwilling or unable to fix their defective transmission").

With respect to Player, he alleges that "[i]n early 2018, while [his] vehicle was still covered by the Basic Limited Warranty, the [Panel] Defect began to manifest on both front doors. He took the car to [an authorized FCA dealership] right away, which documented the [Panel] Defect, submitted it to [FCA] via a digital imaging case, and told him they would call if the repairs were approved under warranty." (*Id.* at ¶120, PageID.538.)  FCA subsequently approved repairs, and the dealership "replaced both front door panels." (*Id.* at ¶¶ 122-123, PageID.538.)  But less than six months later, "the [Panel] Defect reappeared." (*Id.* at ¶124, PageID.539.)  When he returned to the dealership, he was told that FCA would not approve a free repair because his warranty had expired. (*See id.*)

FCA argues that Player's allegations do not amount to a breach of the warranty because it authorized a free repair of his vehicle during the term of his

warranty and that repair was completed.  Player acknowledges that FCA did authorize an initial repair and that that repair temporarily alleviated the problems with the door panels.  However, Player plausibly alleges that this repair was not successful.  He contends that the repair was a mere temporary and insufficient fix rather than a proper repair that restored the panels to their original and working condition.  And courts have held that where a plaintiff alleges that a repair "did not remedy the underlying defective components," then determining "whether Defendant fulfilled its responsibilities under the Warranty is a fact question." *Bang v. BMW of N. Am., LLC*, 2016 WL 7042071, at ** 6-7 (D.N.J. Dec. 1, 2016) (concluding that it was "premature" to dismiss breach of express warranty claim where plaintiff alleged that the defendant "failed to properly repair, replace, or adjust malfunctioning Class Vehicles to a non-defective state").  For these reasons, the Court declines to dismiss Player's express warranty claim on the ground that he fails to plead a breach of the warranty.

### 3

Finally, FCA argues that Player's breach of express warranty "claim fails for lack of notice." (Mot. to Dismiss, ECF No. 16, PageID.667.)   The Court disagrees.

In *Weidman v. Ford Motor Co.*, 2019 WL 3003693 (E.D. Mich. July 10, 2019), a case relied upon by FCA, another Judge of this Court explained that "[u]nder Texas law, a claim for breach of express warranty requires a plaintiff to

have provided pre-suit notice of the alleged breach to both the seller and remote manufacturer of the defective product." *Id.* at *3.  And the court noted that "the manufacturer must be made aware of a problem with a particular product purchased by a particular buyer." *Id.* (quoting *U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 201-02 (Tex. App. 2003)).  That is what Player alleges here.  He claims that he provided notice of the Panel Defect to his local authorized FCA dealership, and that the dealership then submitted photographs of Player's car and Player's request for a repair directly to FCA via FCA's "digital imaging" system. (Am. Compl. at ¶¶ 120, 122, ECF No. 14, PageID.538.)  Under these circumstances, Player plausibly alleges that he provided sufficient pre-suit notice of the Panel Defect to FCA.

For all of the reasons stated above, the Court declines to dismiss Player's or Ferndanez' breach of express warranty claims.[7]

---

[7] Player's and Fernandez' federal MMWA claims (*see* Am. Compl. at Count 3) "rise[] and fall[] with the underlying state law claim[s]." *Smith v. Nexus RVs, LLC*, 468 F.Supp.3d 1012, 1025-26 (N.D. Ind. 2020).  Thus, because the Court declines to dismiss Player's or Fernandez' breach of express warranty claims, it will also decline to dismiss their MMWA claims to the extent that those claims rest on FCA's alleged breach of the express warranty.

## C

The Court now turns to Player's and Fernandez' implied warranty claims.[8] FCA first argues that these claims fail because Player and Fernandez do not plead that the Class Vehicles were unmerchantable. The Court agrees.

Under Texas law that applies to Player's claim, to state a viable breach of implied warranty claim, a plaintiff must allege that his vehicle was "unfit for the ordinary purposes for which [it is] used." *Jeong v. Mercedes-Benz USA, LLC*, 2013 WL 11331283, at *1 (N.D. Tex. 2013). Likewise, under Florida law that applies to Fernandez' claim, the "implied warranty of merchantability ensures consumers that a purchased good will be suitable for its ordinary purpose." *Masforce Europe, BVBA v. Mastry Marine & Indus. Design, Inc.*, 2013 WL 12156533, at *9 (M.D. Fla. 2013). Here, Player and Fernandez allege that their vehicles were unmerchantable and not suitable for their "ordinary purpose" in two respects: (1) the Panel Defect constituted a "safety hazard" and (2) the ordinary purpose of their vehicles was not simply to provide transportation, but instead the vehicles were "part art," and the Panel Defect interfered with that latter purpose. (Resp. to Mot. to Dismiss, ECF No. 17, PageID.1019.) Neither argument persuades the Court that the Class Vehicles were unmerchantable.

---

[8] Plaintiffs Player and Fernandez are the only named Plaintiffs to bring implied warranty claims. (*See* Am. Compl. at Count 2.)

24

**1**

Player and Fernandez do not plausibly allege that the Class Vehicles suffer from a safety defect that renders the cars unmerchantable.  Neither Fernandez nor Player alleges that he personally experienced any kind of safety defect.  Instead, they appear to rely on the experiences of a different named Plaintiff who is not bringing an implied warranty claim – Dorthea Johnson.  Johnson claims that the Panel Defect made "the inside of [her] vehicle extremely hot and caus[ed] the windshield and windows to fog and [her] visibility to decrease." (Am. Compl. at ¶110, ECF No. 14, PageID.535-536.)  While the fogging of windows during driving does raise safety concerns, *see*, *e.g.*, *In re General Motors Air Conditioning Marketing and Sales Practices Litigation*, 406 F.Supp.3d 618, 633 (E.D. Mich. 2019) (concluding that "the lack of functioning air conditioning creates a safety risk by inhibiting [a driver's] ability to de-fog his windshield and windows and thereby hindering his ability to see the road"), Player and Fernandez do not plausibly connect the Panel Defect to window fogging.  While they allege that the "[i]nternet is rife with dozens of websites devoted to thousands of complaints from Charger, Challenger, and 300 vehicle owners dating back to at least 2015" (Am. Compl. at ¶5, ECF No. 14, PageID.480), and while they quote from approximately 75 such internet posts in the Amended Complaint, they do not identify any vehicle owners, other than Johnson, who experienced and/or complained about the Panel Defect causing their windows

to fog.  Their allegations thus do not support a plausible inference that any owner of a Class Vehicle other than Johnson experienced window fogging.  And their allegation that one vehicle owner out of many thousands experienced fogging cannot support a reasonable inference that the Panel Defect causes fogging in the Class Vehicles.

Player and Fernandez further insist that the Panel Defect causes a second safety hazard: it interferes with the operation of their vehicle locks.  Malfunctioning locks could rise to the level of a safety defect if, for instance, they impeded a driver's ability to exit his vehicle after a crash.  However, as with the fogging issue discussed above, Player and Fernandez do not plausibly link the Panel Defect to a problem with vehicle locks.  None of the named Plaintiffs experienced any issues with their locks.  And of the "thousands of complaints" that Player and Fernandez reviewed, they identified just one that even mentioned locks.  In August of 2020, a vehicle owner complained that his "door panel" uplifting and "separat[ing] from [his] door frame cause[d] the locking mechanism to malfunction on occasion." (*Id.* at ¶55, PageID.495-496.)   But the identified complaint does not quantify what "on occasion" means or explain how the locks actually malfunctioned.   More importantly, Player and Fernandez do not allege that any other owner of a Class Vehicle experienced an issue with the locking mechanism.   Their allegations

26

therefore fall short of plausibly alleging that the Panel Defect causes a safety issue with the Class Vehicles' locks.[9]

### 2

The Court is not also persuaded that the Class Vehicles are unfit for their ordinary purpose on the basis that the Panel Defect interferes with the cosmetic appearance of the vehicles.  Player and Fernandez do not plausibly allege that the appearance of the vehicles is an aspect of their ordinary purpose.  In their briefing in opposition to FCA's motion to dismiss, Player and Fernandez argue that their vehicles are "part transportation, part art, and [FCA] has advertised them as such." (Resp. to Mot. to Dismiss, ECF No. 17, PageID.1019.)  But Player and Fernandez do not actually (or plausibly) allege in the Amended Complaint that FCA has marketed the Class Vehicles as pieces of "art" that have an ordinary purpose separate and apart from their use for transportation.  Instead, they allege only that FCA marketed the class vehicles as being "premium luxury cars" that feature "attractive styling." (Am. Compl. at ¶69, ECF No. 14, PageID.520.)  That allegation falls short of supporting a plausible inference that the ordinary purpose of the Class Vehicles included serving as a piece of "art."

---

[9] In the Amended Complaint, and in response to FCA's motion to dismiss, Player and Fernandez also argue that the Panel Defect causes a safety defect with respect to the deployment of the Class Vehicles' airbags.  At the hearing on the motion to dismiss, Player's and Fernandez' counsel indicated that Player and Fernandez were no longer pursuing that argument.

Player and Fernandez counter that "[i]n evaluating the implied warranty claim, the Court should consider the purpose of the purchase." (Resp. to Mot. to Dismiss, ECF No. 17, PageID.1020.)  They argue that they purchased the Class Vehicles, at least in part, to show off the attractive styling of the vehicles, and they argue that this purpose was frustrated by the Panel Defect. (*See* Am. Compl. at ¶¶ 117, 157, ECF No. 14, PageID.537, 547-548.)  In support of that argument, Player and Fernandez point the Court to the decision in *Masforce*, *supra*.  *Masforce* involved the sale of a racing boat.  The plaintiff alleged that he purchased the racing boat "to enter it into P1 European powerboat racing competitions." *Masforce*, 2013 WL 1215633, at *2.  And the court declined to grant summary judgment on a breach of implied warranty claim because it determined that there was a question of fact about whether the boat could safely operate "under race conditions." *Id.* at *10.

*Masforce* is distinguishable and does not apply here.  In *Masforce*, "it [was] undisputed" that the boat at issue "was designed and built to compete in offshore powerboat racing." *Id.* at *9.  Thus, "the ordinary purpose protected by the implied warranty was that it would be fit to [race]." *Id.*  Moreover, the plaintiff alleged that a representative of the defendant told him that the boat at issue had the "same qualities" as a previous racing boat he had purchased. *Id.* at *2.  Here, however, Player and Fernandez do not plausibly allege that the Class Vehicles were "designed and built" to be pieces of art or otherwise displayed.  And, as explained above, Player

and Fernandez do not identify any representations from FCA that the Class Vehicles were designed to be displayed as pieces of art as opposed to driven like most other vehicles on the market.   Therefore, *Masforce* does not persuade the Court that the Class Vehicles are unfit for their ordinary purpose.   The Court will therefore dismiss Player's and Fernandez' implied warranty of merchantability claims.

## D

The Court now turns to FCA's argument that Plaintiffs' unjust enrichment claim is "subject to dismissal …. because a 'comprehensive' express contract governed their rights to obtain free vehicle repairs from FCA." (Mot. to Dismiss, ECF No. 16, PageID.673.)   The Court agrees.   As the Court recently explained when rejecting similar unjust enrichment claims brought by a group of vehicle owners against the manufacturer of their vehicles, a vehicle purchaser cannot maintain an unjust enrichment claim where there is an express warranty that governs the same subject matter as his unjust enrichment claims:

> Plaintiffs' unjust enrichment claim is not cognizable because there is an express contract that covers the same subject matter – namely, the express limited warranty that GM provided at the time the Class Vehicles were first purchased.   "Courts will not imply a contract" for the purposes of an unjust enrichment claim "where there is an express contract governing the same subject matter." *GM Air Conditioning*, 406 F. Supp. 3d at 634 (emphasis removed) (dismissing unjust enrichment claim). *See also FLF, Inc. v. World Publ'ns, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be

brought where the subject matter of the claim is covered by an express contract between the parties"); *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996) ("Under [] California ... law, unjust enrichment is an action in quasi-contract, which does not lie when an enforceable, binding agreement exists defining the rights of the parties."). Indeed, courts have regularly dismissed unjust enrichment claims filed against automobile manufacturers where a valid, enforceable express warranty covers the same subject matter as plaintiffs' unjust enrichment claims. *See*, *e.g.*, *McKee*, 376 F. Supp. 3d at 762 ("Because the [w]arranty governs [p]laintiff's claims against GM for the Transmission Defect, a claim for unjust enrichment is unavailable to him."); *Mitchell v. Gen. Motors, LLC*, 2014 WL 1319519, at *15 (W.D. Ky. Mar. 31, 2014) (granting GM's motion to dismiss unjust enrichment claim where "the written [w]arranty is an explicit contract that governs their relationship"); *Miller v. Gen. Motors, LLC*, 2018 WL 2740240, at *15 (E.D. Mich. June 7, 2018) (holding that plaintiffs' "unjust enrichment claims … fail because the terms of the GM Limited Warranty governs the parties' rights and obligations with respect to defects in materials and workmanship, and thus no contract will be implied in law to defeat the GM Limited Warranties' express terms"). Thus, because the express limited warranty governs the same subject matter as Plaintiffs' unjust enrichment claim, that claim fails. *See GM Air Conditioning*, 406 F. Supp. 3d at 635.

*Hall v. General Motors, LLC*, 2020 WL 1285636, at *10 (E.D. Mich. Mar. 18, 2020) (internal footnote omitted). *See also In re General Motors Air Conditioning Marketing and Sales Practices Litigation*, 406 F.Supp.3d at 634 ("Plaintiffs cannot maintain their unjust enrichment claim here because there is an express contract governing the same subject matter as that claim – the express Limited Warranty").

Plaintiffs counter – like the plaintiffs did in *Hall* – that "[u]njust enrichment claims routinely are allowed to proceed when pleaded in the alternative to other viable claims for relief." (Resp. to Mot. to Dismiss, ECF No. 17, PageID.1026; internal quotation omitted).  And they insist that this case is unlike *Hall* because "FCA disputes the application of the Basic Limited Warranty." (*Id.*, PageID.1027; emphasis in original.)

But here, there is no dispute that the express warranty exists and that it governs the subject matter of which repairs FCA has agreed to perform.  What the parties disagree about is whether the precise Panel Defect at issue is one of the defects that FCA has agreed to repair.  This is therefore not a case where FCA denies that an express warranty exists or that it is bound by the terms of that warranty.  Thus, as in *Hall*, because there is a contract that covers the same subject matter of this dispute (*i.e.*, what kind of defects FCA will agree to repair), Plaintiffs may not maintain an unjust enrichment claim as an alternative to their breach of express warranty claims. *See Gregorio*, --- F.Supp.3d ---, 2021 WL 778913, at ** 20-21 (dismissing unjust enrichment claims where express warranty "governe[d] the parties' relationship and [defendant's] duties to remedy defects" and where "[t]he dispute [was] over what types of defect [the defendant was] required to repair or replace under the warranty"). Accordingly, the Court will dismiss Plaintiffs' unjust enrichment claim.

## E

Finally, FCA argues that the Court should dismiss Plaintiffs' fraud-based claims, which include both a common-law fraud claim and "statutory fraud claims under the laws of [each Plaintiffs'] state of residence." (Mot. to Dismiss, ECF No. 16, PageID.671-672, 674-680.)  Plaintiffs' fraud-based claims rest on two different predicates: alleged affirmative misrepresentations and alleged fraudulent omissions. The Court agrees that Plaintiffs fail to state viable claims based on either affirmative misrepresentations or fraudulent omissions.

## 1

The Court begins with Plaintiffs' fraud-based claims based on affirmative misrepresentations.  The Court dismisses those claims.  In the Amended Complaint, Plaintiffs allege that FCA affirmatively "described the [Class] Vehicles" in advertising "as premium, luxury cars (the 300), and premium muscle cars (the Charger and Challenger), with attractive styling, that are well-built, safe, and reliable." (Am. Compl. at ¶69, ECF No. 14, PageID.520.)   But these general representations are examples of non-actionable puffery, *i.e.*, "an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying." *Pizza Hut, Inc. v. Papa John's Intern. Inc*., 227 F.3d 489, 497 (5th Cir. 2000). *See also Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 271 (6th Cir. 2018) (explaining that "puffery is a fact of life" and that "reasonable consumers

know that marketing involves some level of exaggeration—what the law calls 'puffery.'").  Courts in this district have repeatedly held that the kind of broad, non-quantifiable statements about a vehicle's safety or reliability that Plaintiffs identify here are non-actionable puffery, and this Court agrees with those rulings. *See*, *e.g.*, *Bledsoe v. FCA US LLC*, 378 F.Supp.3d 626, 648-49 (E.D. Mich. 2019) ("Defendants' individual statements along the lines that the trucks are the cleanest or best in the world are nonactionable puffery"); *Gamboa v. Ford Motor Company*, 381 F.Supp.3d 853, 875 (E.D. Mich. 2019) ("[P]romises of efficiency and reliability 'cannot form the basis for a fraud claim.'"); *Raymo v. FCA US LLC*, 475 F.Supp.3d 680, 706 (E.D. Mich. 2020) ("Statements such as 'leading fuel economy,' 'unprecedented performance and fuel economy,' 'environmentally clean,' 'low-cost of ownership' and 'built to last for years' are general and nonquantifiable. The Court therefore considers them nonactionable puffery.").  Plaintiffs' fraud-based claims that arise out of FCA's alleged affirmative misrepresentations are therefore dismissed.

## 2

The Court next turns to Plaintiffs' fraud-based claims that arise out of FCA's alleged fraudulent omissions.

**a**

"For claims involving fraudulent omissions," Federal Rule of Civil Procedure 9(b) "requires a plaintiff to plead the who, what, when, where, and how of the alleged omission." *McKee v. Gen. Motors*, *LLC*, 376 F.Supp.3d 751, 760-61 (E.D. Mich. 2019). "Specifically, a plaintiff pleading a fraudulent omission must allege (1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud." *Id.* at 761 (internal quotation marks omitted). In the context of an allegedly defective product, "[a] complaint may suffice if it alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that the plaintiffs would not have purchased the product or would have paid less for it had they known of the defect." *Id*

**b**

FCA argues, among other things, that the Court should dismiss all of Plaintiffs' fraudulent omission claims because Plaintiffs fail to plead that FCA had pre-sale knowledge of the Panel Defect. (*See* Mot. to Dismiss, ECF No. 16, PageID.679-680.)   FCA insists that Plaintiffs' "generic allegations 'fail[] to sufficiently allege that FCA had knowledge – let alone exclusive knowledge – of the

defect.'" (*Id.*, PageID.680, quoting *Beck v. FCA US LLC*, 273 F.Supp.3d 735, 735

(E.D. Mich. 2017).)  The Court agrees.

Plaintiffs first say that they plausibly allege FCA's pre-sale knowledge of the

Panel Defect based on pre-sale testing that FCA performed on the Class Vehicles.

These allegations are as follows:

> 73.  During the pre-release process of designing, manufacturing, engineering, and testing the Subject Vehicles, Defendant necessarily would have gained comprehensive and exclusive knowledge about the Defect, particularly the basic engineering principles behind the construction and function of the interior trim panels and the expected conditions and uses the panels would encounter in ordinary use.
>
> 74.  For example, Defendant maintains and operates multiple "proving grounds" where it performs validation testing on its new vehicles, including in Yucca, Arizona, Chelsea, Michigan, and Naples, Florida. The Yucca proving grounds, for instance, at elevations ranging from 500 to 6,500 feet above sea level and varied terrain and annual temperatures ranging from 30°F to 120°F, provides a wide spectrum of vehicle testing conditions, including the hot conditions which many of Defendant's authorized dealer service personnel have indicated exacerbate the Defect.
>
> 75.  An adequate pre-release analysis of the design, engineering, and manufacture of the trim panels in the Subject Vehicles would have revealed to Defendant that the panels were defective and susceptible to pulling away from the frame and warping.

(Am. Compl. at ¶¶ 73-75, ECF No. 14, PageID.521-522.)  But these general

allegations are like those that the United States Court of Appeals for the Sixth Circuit

recently held were insufficient to show pre-sale knowledge in *Smith v. Gen. Motors LLC*, 988 F.3d 873 (6th Cir. 2021).  In *Smith*, the plaintiffs alleged that the defendant must have learned about an alleged defect in the defendant's vehicles during pre-production testing. *See id.* at 875-876.  More specifically, the plaintiffs claimed that during this testing, the defendant would "have learned that panel cracking could lead to serious hazards for drivers, including adverse deployment of the passenger side airbag and sharp shards of flying debris inside the vehicle.  Relying on information and beliefs about automobile industry standards and the requirements of pre-production testing, Plaintiffs thus assert[ed] that [the defendant] knew of the defective dashboards before [the subject] vehicles hit the market." *Id.* at 876 (internal punctuation and citation omitted).

The Sixth Circuit held that these allegations regarding pre-release testing were insufficient because the plaintiffs made "no specific allegations about the results of the tests, such as data obtained by [the defendant] or documents confirming or suggesting whether the defect became known.  And just because plaintiffs plead[ed] testing and the testing could reveal the safety risks alleged, does not make it plausible that [the defendant] knew of the existence of these safety risks." *Id.* at 884.  The court then specifically highlighted that the plaintiffs had failed to plead that the "pre-production testing [actually] alerted [the defendant] to the defect." *Id.*  Similarly here, Plaintiffs do not make any specific allegations regarding the results of the pre-

36

sale testing, nor do Plaintiffs present any allegation that the testing actually made FCA aware of the Panel Defect. Plaintiffs offer no more than "speculation about what testing might have shown." *Id.* at 886. Thus, as in *Smith*, Plaintiffs' "assertions" that FCA's "routine testing … should have alerted it to a dangerous defect are not enough to meet the 12(b)(6) pleading standard." *Id.*

Next, Plaintiffs allege that FCA had pre-sale knowledge of the Panel Defect because of complaints that customers made to FCA directly, to the National Highway Safety Traffic Safety Administration ("NHTSA"), and on various websites, including the website of FCA affiliate Mopar. But the identified complaints do not plausibly establish FCA's *pre-sale* knowledge of the Panel Defect because nearly all of the complaints were made after Plaintiffs purchased their vehicles and/or after Plaintiffs' vehicles were first sold. For example, in the Amended Complaint, Plaintiffs quote from 13 complaints filed with NHTSA. (*See* Am. Compl. at ¶¶ 55, 61-62 ECF No. 14, PageID.495-496, 513-519.) But these complaints are from 2018, 2019, and 2020. The latest any named Plaintiff purchased a new vehicle was in 2017.[10] (*See id.* at ¶16, PageID.483-484.) Thus, these complaints post-date any original sale of the vehicles owned by the named Plaintiffs

---

[10] The only named Plaintiff to purchase a vehicle after 2018 was Plaintiff Bennett "who purchased a used 2017 model Dodge Charger" in or about "August 2020." (Am. Compl. at ¶17, PageID.484.) Bennett does not allege that he purchased his car from an authorized FCA dealership, nor does he allege when FCA and/or an authorized FCA dealership first sold the Charger he purchased.

and cannot show that FCA knew about the Panel Defect before it sold Plaintiffs their cars.  Likewise, the identified consumer complaints from the Mopar website are undated, and therefore cannot show that FCA had pre-sale knowledge of the Panel Defect. (*See id.* at ¶57, PageID.497-502.)   Plaintiffs also quote from consumer complaints found on several other websites not affiliated with FCA. (*See id.* at ¶¶ 58-60, PageID.502-513.)  But "Plaintiffs' assertion that [FCA] reads online message boards and scours [various] complaint database[s] is speculative absent any supporting facts." *Smith*, 988 F.3d at 885.  In addition, most of these complaints were made after Plaintiffs purchased their vehicles.  And most importantly, Plaintiffs do not plausibly allege that these complaints from unaffiliated websites were "frequent enough" to be more than a "blip on [FCA's] complaints-and-repairs radar considering the millions of [FCA] cars in use." *Id.* (internal quotation marks omitted).   For all of these reasons, Plaintiffs' allegations regarding customer complaints are insufficient to plausibly establish FCA's pre-sale knowledge of the Panel Defect.

Finally, Plaintiffs say that FCA was aware of the Panel Defect through "repair and parts data trends" and "warranty claims and communications with service technicians." (Resp. to Mot. to Dismiss, ECF No. 17, PageID.1035.)   More specifically, Plaintiffs allege that FCA "knew or should have known about the [Panel] Defect because of the large number of claims for interior trim panel repairs

and part replacements made during the Subject Vehicles' warranty periods." (Am. Compl. at ¶76, ECF No. 14, PageID.522.)   And Plaintiffs claim that "[d]ue to [FCA's] efforts to monitor defect trends and the sheer number of repairs and warranty/goodwill requests made in connection with the [Panel] Defect, [FCA] knew or should have known of the [d]efect." (*Id.* at ¶79, PageID.523.)   Plaintiffs also assert that "[t]he ongoing high sales of replacement door and trim panels and the adhesive used to bond them to the frame was certainly known to [FCA] – indeed the parts were (and continue to be) on national backorder – should have alerted [FCA] that its panels were defective." (*Id.* at ¶81, PageID.524.)   But as with Plaintiffs' allegations concerning customer complaints, none of these allegations (nor any other allegations in the Amended Complaint) plausibly allege that FCA had *pre-sale* knowledge of the Panel Defect.  The fact that at some unidentified point after FCA began selling the Class Vehicles, certain parts became backordered and/or warranty claims increased says little about when FCA acquired knowledge of the Panel Defect, and more importantly, whether that knowledge was obtained prior to any of the named Plaintiffs buying their vehicles.  The Court is not persuaded that an uptick in warranty claims or parts orders at some unidentified time supports a plausible inference that FCA had pre-sale knowledge of the Panel Defect.

In sum, the Amended Complaint does not plausibly allege that FCA had pre-sale knowledge of the Panel Defect.  The Court therefore will dismiss Plaintiffs' fraud-based claims to the extent that they are based on alleged fraudulent omissions.

## V

Finally, during the hearing on FCA's motion to dismiss, Plaintiffs' counsel suggested that if granted the opportunity, Plaintiffs may be able to amend their Amended Complaint to potentially cure at least one of the deficiencies identified by FCA.  Requests to amend are governed by Federal Rule of Civil Procedure 15(a), which provides that a "court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  But "in order to determine" whether justice requires leave to amend, "the court must have before it" more than just a general oral request to amend. *Beydoun v. Sessions*, 871 F.3d 459, 469-70 (6th Cir. 2017).  At an absolute minimum, the Court must be presented with "the substance of the proposed amendment." *Id.*  For example, in *Beydoun*, the Sixth Circuit affirmed the denial of a motion to amend where, as here, a party made an oral request to amend at a hearing but did not "inform[] the district court of what facts he would use to supplement his claim, thus allowing him to withstand a motion to dismiss." *Id.* at 470. *See also Quicken Loans, Inc. v. United States*, 152 F.Supp.3d 938, 955 n. 13 (E.D. Mich. 2015) (holding that oral request to amend at hearing on motion to dismiss was not sufficient "because [Rule 15(a)(2)] requires the filing of a motion").  Plaintiffs have

not filed a proper motion to amend, nor have they presented the Court a proposed Second Amended Complaint that includes the specific factual allegations they wish to add.  The Court declines to grant Plaintiffs leave to amend based upon Plaintiffs' oral general request to amend at the hearing on the motion to dismiss.[11]

**VI**

For all of the reasons explained above, FCA's motion to dismiss (ECF No. 16) is **GRANTED IN PART AND DENIED IN PART**.

The motion is **DENIED** with respect to the claims by Plaintiffs Player and Fernandez for breach of express warranty under state law and under the MMWA (Counts I and III of the Amended Complaint). The motion is further denied to the extent that it seeks dismissal of the nationwide class allegations on the basis that that the Plaintiffs lack Article III standing to bring claims on behalf of a nationwide class. The Court will later decide, when and if either party raises the issue by motion,

---

[11] The Court notes that Plaintiffs have already had one opportunity to amend their Complaint in order to cure the alleged deficiencies in their pleadings.  As explained above, FCA initially moved to dismiss Plaintiffs' claims on December 14, 2020. (*See* Mot., ECF No. 10.)  In that motion, FCA raised the same arguments that the Court addressed in this Opinion and Order. (*See id.*)  Rather than respond to FCA's motion, Plaintiffs filed an Amended Complaint. (*See* Am. Compl., ECF No. 14.) Thus, Plaintiffs have already had one opportunity to add additional factual allegations to address the pleading deficiencies identified by FCA.  That Plaintiffs have already had that opportunity is relevant to whether justice "require[s]" further leave to amend. Fed. R. Civ. P. 15(a)(2).

whether Player and Fernandez may pursue their claims on behalf of a nationwide (or some other) class under Rule 23 of the Federal Rules of Civil Procedure.

The motion is **GRANTED** in all other respects.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE
Dated:  August 17, 2021


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 17, 2021, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764