UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DORTHEA JOHNSON, *et al.*,

      Plaintiffs,

v.

FCA US LLC,

      Defendant.

Case No. 20-cv-12690
Hon. Matthew F. Leitman

_____/

## ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT (ECF No. 65)

Plaintiffs Jason Player and Francisco Fernandez each purchased 2016 Dodge Charger vehicles manufactured by Defendant FCA US LLC.  Their vehicles were covered by an express limited warranty.  The door and console panels on the vehicles eventually began to warp and delaminate.  Player and Fernandez then sought repairs from FCA under their warranties.  They say that FCA refused and/or was unable to repair their vehicles.  They then filed this putative class action.  Their sole remaining claims are for breach of express warranty.  FCA has now moved for summary judgment on those claims. (*See* Mot., ECF No. 65.)  For the reasons explained below, the motion is **GRANTED**.

# I

## A

FCA is one of the world's leading automakers.  Player purchased a new 2016 Dodge Charger manufactured by FCA from Viva Dodge in El Paso, Texas on December 30, 2015. (*See* Player Dep., ECF No. 65-3, PageID.2237.)  Fernandez purchased a new 2016 Dodge Charger Hellcat manufactured by FCA from Jerry Ulm Chrysler Dodge Jeep Ram in Tampa, Florida in or around July 2017. (*See* Fernandez Dep., ECF No. 65-4, PageID.2334-2335.)

Both vehicles were covered by FCA's Basic Limited Warranty (the "Express Warranty").  The Express Warranty provided, in relevant part, that FCA would "cover[] the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship, or factory preparation." (Express Warranty, Ex. I to Player Dep., ECF No. 65-3, PageID.2275.)  The Express Warranty began when Player and Fernandez purchased their vehicles and "last[ed] for 36 months from the date it [began] or for 36,000 miles on the odometer, whichever occur[ed] first." (*Id.*, PageID.2276.)

## B

Both Player and Fernandez say that after they purchased their vehicles, they began to notice a warping and delamination of the door panels and/or console panels on their vehicles (the "Panel Defect").  Player testified that in December 2017, two

2

years after he purchased his vehicle and while it was still covered by the Express Warranty, he returned to his dealership and reported that both front interior door panels had began to "warp[]" and "separate[] from the other part of the door." (Player Dep., ECF No. 65-3, PageID.2242-2243; Service Record, Ex. L to Player Dep., ECF No. 65-3, PageID.2313.)  Player brought his car in for repair, and FCA replaced both front door panels at no charge. (*See* Player Dep., ECF No. 65-3, PageID.2244.) Player then did not experience any other warping or delamination of his door panels for several years.

However, in July 2020, after Player's Express Warranty had expired, Player reported to his dealership that he began noticing additional delamination and "lift[ing]" of the panels in his "dash," "interior console," and "rear passenger door." (*Id.*, PageID.2255-2258.) When Player "inquir[ed]" about a repair, the dealership told him that because the Express Warranty had expired, he had two options: (1) he could pay for the repairs out of pocket or (2) he could contact FCA and ask FCA to cover the cost of the repairs. (*Id.*, PageID.2259-2260, 2262.)  Player chose not to contact FCA.  He says that he researched the Panel Defect online, learned that "no one was [successful in] getting the repairs authorized," and concluded that contacting FCA "would be a waste of time." (*Id.*, PageID.2260, 2264.)

Fernandez experienced similar issues with his Dodge Charger.  Fernandez took his Charger to his dealership for an oil change in August or September of 2017

(less than two months after he purchased his vehicle), and he was told at that time that the two front door panels were becoming "unglued" and had "start[ed] to come off." (Fernandez Dep., ECF No. 65-4, PageID.2347-2349.)  But he was told that FCA would not "approve" a repair at that time because the panels were not "loose yet completely." (*Id.*, PageID.2350.)  Approximately one year later, in September 2018, Fernandez noticed that the two rear door trim panels were becoming delaminated, and he sought a repair under the Express Warranty for all four door trim panels. (*See id.*, PageID.2354; Service Record, Ex. I to Fernandez Dep., ECF No. 65-4, PageID.2425.)  FCA approved the repair.  Fernandez's dealership then ordered new door panels, but the panels were on backorder and were "not currently available." (Service Record, Ex. I to Fernandez Dep., ECF No. 65-4, PageID.2425.)  By December 2018, Fernandez's dealership had still not been able to acquire replacement door panels for his vehicle. (*See* Fernandez Dep., ECF No. 65-4, PageID.2374; Ex. N to Fernandez Dep., ECF No. 73-7, PageID.3363-3364.)  Instead of continuing to wait for new door panels to arrive, on December 13, 2018, Fernandez traded in his Charger for a Chrysler Pacifica. (*See* Ex. N to Fernandez Dep., ECF No. 73-7, PageID.3364.)

## C

Player and Fernandez assert that the Panel Defect arose because FCA chose to use a sub-standard material in the door and console panels in order to save money.

4

According to Player and Fernandez, the "door trim panels and console panels" of their vehicles "consist of three different materials: (1) an inner, plastic 'substrate', (2) a plastic 'skin' material, and (3) a foam, placed between the substrate and skin." (Plas.' Resp., ECF No. 73, PageID.3021-3022, quoting Dep. of Chrysler 30(b)(6) witness Saurabh Kumar, ECF No. 73-8, PageID.3410.)  They highlight that in May and June 2013, FCA's Technical Cost Reduction Team concluded that FCA could save at least $650,000 per year by changing the materials used to manufacture the door and console panels. (*See id.*, PageID.3023, citing Kumar Dep., ECF No. 73-8, PageID.3414-3416.)  And they point out that one of the changes that FCA made was to the "skin" piece of the panels.  More specifically, Player and Fernandez note that FCA changed the polymer material used in the skin from "PolyOne PCV CBX3471" to a material called "Belleville C10." (*Id.*, citing FCA Change Notice Worksheets, ECF Nos. 73-13, 73-15. *See also* Kumar Dep., ECF No. 73-8, PageID.3416-3417.)

Player and Fernandez contend that the Belleville C10 material was not "appropriate for use in vehicles sold in the Southern United States with above average temperatures" because Belleville C10 was "prone to delamination" in those warmer environments. (Plas.' Resp., ECF No. 73, PageID.3026, 3028.)  They assert that the Belleville C10 material would "shrink" in warm weather, which in turn caused "the skin and skin/foam to pull away from the [] substrate [material]." (*Id.*, PageID.3025, quoting Internal FCA Emails, ECF No. 73-29, PageID.3670.)  And

they say this caused the door and console panels to warp, separate, and/or delaminate. (*See id.*)  Simply put, as counsel for Player and Fernandez agreed during the hearing on FCA's motion, Player and Fernandez view "the problem here" as being that "the C10 wasn't strong enough to do its job in the heat."[1]

Notably, as counsel for Player and Fernandez further candidly admitted during the hearing, there is no evidence in the record that the batches of Belleville C10 that FCA used was in any way different from, or tainted as compared to, a "perfect" batch of Belleville C10.  Player and Fernandez simply claim that Belleville C10 was the wrong polymer to use in the "skin" component.

FCA does not dispute that point.  On the contrary, it has acknowledged that, particularly in warmer environments, the Belleville C10 material was insufficient to prevent warping and delamination of door and console panels.  John Jezuit, a project chief at FCA, explained that the Belleville C10 material was "not compatible […] for use in" the "southern [United States] and Saudi Arabia" with the other materials that FCA used in the door and console panels. (Jezuit Dep., ECF No. 73-9, PageID.3487.)  In November 2018, FCA stopped using the Belleville C10 material to manufacture the panels in its vehicles. (*See id.*, PageID.3455-3456.)

---

[1] The official transcript of the hearing on FCA's summary judgment motion is not currently available.  The Court has reviewed its notes from the hearing as well as an unofficial version of the transcript of the hearing, and it is confident that the statements attributed to counsel in this order are correct and accurate.

**II**

Player, Fernandez, and several other Plaintiffs filed an Amended Class Action Complaint in this action on January 22, 2021. (*See* Am. Compl., ECF No. 14.) Plaintiffs brought claims against FCA arising out of the Panel Defect for breach of express and implied warranties under state law and under the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*., fraud, unjust enrichment, and violations of the consumer protection laws of various states.

On February 23, 2021, FCA moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Mot. to Dismiss, ECF No. 16.)  Following a hearing, the Court granted that motion in part and denied it in part. (*See* Op. and Order, ECF No. 27.)  In that Opinion and Order, the Court dismissed all of Plaintiffs' claims *except* for breach of express warranty claims brought by Player and Fernandez. (*See id.*)  In these sole remaining claims, Player and Fernandez allege that (1) the Panel Defect is covered by the Express Warranty because it is a defect in "material" and (2) FCA breached the Express Warranty when it failed and/or refused to repair the defect. (*See* Am. Compl. at ¶ 267, ECF No. 14, PageID.574; Pla.s' Resp., ECF No. 73, PageID.3040-3041, 3043-3044.)

FCA has now moved for summary judgment on Player's and Fernandez's remaining breach of warranty claims. (*See* Mot., ECF No. 65.)  As relevant here, FCA argues that the Express Warranty does not cover the Panel Defect because it is

a "design defect," rather than a defect in "material." (*Id.*, PageID.2210-2215.) Plaintiffs respond that the Court should deny the motion because, at a minimum, there are disputed questions of fact concerning whether the Express Warranty covers the Panel Defect. (*See* Pla.s' Resp., ECF No. 73, PageID.3042.)

The Court held a hearing on the motion on December 7, 2023.

## III

Under Federal Rule of Civil Procedure 56, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

**IV**

**A**

The dispositive question before the Court is: does the Express Warranty cover the Panel Defect?[2] As quoted above, the Express Warranty covers defects "in material, workmanship or factory preparation."  Player and Fernandez insist that the Express Warranty covers the Panel Defect because that defect is one in "material." The steps of their argument are straightforward: the Panel Defect (as even FCA admits) is caused by Belleville C10; Belleville C10 is a "material"; therefore, the Panel Defect is a defect in "material" that is covered by the Express Warranty. (*See* Pla.s' Resp., ECF No. 73, Page.3039-3041.)

This argument cannot be reconciled with the settled understanding of a defect in "material."  As the United States Court of Appeals for the Third Circuit has explained, "[i]n the context of product development […] a 'materials' defect is a failing *in the quality of the actual substances used to make a product*." *Coba v. Ford*

---

[2] Player's and Fernandez's breach of express warranty claims are governed by Texas and Florida law respectively.  During the hearing on FCA's motion, counsel for Player and Fernandez acknowledged that he was not aware of any controlling Texas or Florida authority interpreting the Express Warranty (or language similar to that in the Express Warranty) and that the appropriate approach for the Court to take was to look to the relevant body of case law from other jurisdictions and to assume that the highest courts in Texas and Florida would follow the weight of that authority. FCA agreed with that approach.

*Motor Co.*, 932 F.3d 114, 121 (3d Cir. 2019) (emphasis added).[3]  And here, Player and Fernandez concede that they have no evidence that the Belleville C10 used in their vehicles was of sub-standard quality or was less than "perfect" Belleville C10. Without such evidence, they cannot prove that the Panel Defect was a defect in "material" that is covered by the Express Warranty.

Indeed, an unbroken line of federal cases have held that warranties (like the Express Warranty) that cover defects in "material" do not apply to defects (like the Panel Defect) that arise from a manufacturer's *choice* of material that – while not, itself, of sub-standard quality – is insufficient to perform the job for which it was chosen.  The Court begins with the Sixth Circuit's decision in *Lombard Corp. v. Quality Aluminum Products, Co.*, 261 F.2d 336 (6th Cir. 1958).  Although that decision did not involve a claim for breach of an express warranty that covered defects in "material," it provides the analytical foundation on which many of the later cases involving such claims are based.

The defendant in *Lombard* was a "designer and builder of heavy equipment." *Id.* at 337.  In 1953, the defendant sold the plaintiff "a hydraulic aluminum extrusion press weighing about 85 tons and having a 1,500 ton capacity." *Id.*  The proper

___

[3] *See also Valley Fresh Produce, Inc. v. Western Skyways, Inc.*, 2019 WL 4695668, at *11 (D. Colo. Sept. 25, 2019) (defining a defect in "material" as a "failing in the quality of the actual substances used to make a product") (quoting *Coba*, 932 F.3d at 121); *Chung v. Igloo Products Corp.*, 2022 WL 2657350, at ** 13-14 (E.D.N.Y. July 8, 2022) (same, quoting *Coba*).

functioning of the press depended, in large part, upon "four tie rods or columns, each weighing some 3,300 pounds, [that were] located on the machine, two at the top and two at the bottom." *Id.* "The reasonable or expected life of the [press, including the tie rods] was ten years." *Id.* In connection with the sale, the defendant issued "[a]n express warranty of material and workmanship." *Id.* at 338.

"For some nine months the press operated satisfactorily and then two of the tie rods broke." *Id.* After attempts to repair the tie rods and replace them with stronger tie rods failed, the plaintiff sued the defendant. *See id.*

Because the express warranty issued by the defendant "had expired before the first breaking of the tie rods," the plaintiff brought only a claim for breach of implied warranty under Ohio law. The statute on which that claim was based provided "that 'goods shall be reasonably fit for' the purpose for which they were bought." *Id.* (quoting Section 1315.16(A), Ohio R.C.). The plaintiff alleged that prior to the sale transaction, it "had made known to defendant the purpose for which the machine was to be used, namely, the constant extruding of aluminum," and that the defendant delivered a machine that was not fit to perform that function. *Id.* The defendant countered that the express warranty between the parties "negative[d] the implied warranty of fitness" under the Ohio statute because (1) the alleged defect "arose from a defect in material or workmanship" and (2) "[f]reedom from defects in material and workmanship was the subject of the [expired] express warranty." *Id.*

11

The Sixth Circuit rejected the defendant's argument.  The court first explained that "[a] defect in material is a defect in quality." *Id.*  And the court held that tie rods did not suffer from such a defect because "[t]he steel in the tie rods was of excellent quality." *Id.*  The court next explained that unlike a defect in materials, a defect in "design" involves a flaw in "the overall plan of construction and operation." *Id.*  And the court concluded that the problem with the tie rods was a defect in design, not in material, because the problem resulted from the defendant's choice of steel that was too weak to perform the required functions. *See id.* at 338-39.  In the court's words, "[t]he selection of the proper diameter for the rods and for the proper type of steel for the rods was, in fact, a part of the design of the machine." *Id.* at 339.  *Lombard* therefore stands for the proposition that a defect that results from a manufacturer's choice of insufficient materials is a design defect, not a defect in material.

The United States Court of Appeals for the Third Circuit cited *Lombard* for that very proposition in *Coba*, *supra*, a decision in which it held that a defect like the Panel Defect was not covered by a warranty like the Express Warranty.  In *Coba*, the plaintiff filed a "putative consumer class action seeking damages resulting from the delamination, *i.e.*, peeling and flaking, of the lining of certain Ford [Motor Company] truck fuel tanks." *Coba*, 932 F.3d at 116.  Upon investigation, it was determined that the delamination was caused by Ford's choice of a particular coating that it used on the fuel tanks. *See id.* at 123.  The coating Ford chose could not

"tolerate a constant supply of acetic and formic acids in fuel," and when the coating interacted with those acids, it began to peel and flake. *Id.*

The plaintiff in *Coba* brought several claims, including a claim that Ford "breached its written warranty […] by failing to adequately repair and replace his tanks, as the replacements turned out to have the same defects as his original tanks." *Id.* at 118. The warranty at issue in *Coba*, like the Express Warranty here, provided that Ford would "repair, replace, or adjust all parts on [a] vehicle that [were] defective in factory-supplied materials or workmanship." *Id.* at 120. The warranty did not cover defects in design. *See id.*

On appeal, the plaintiff argued that the delamination was caused by a defective material – the coating Ford used on the fuel tanks – and therefore his vehicle was "defective in factory-supplied materials." *Id.* The Third Circuit, relying on and quoting *Lombard*, disagreed. It first explained that "in the context of product development, defects in 'workmanship' and 'materials' are flaws pertaining to the construction or manufacture of a product, while defects in 'design' are shortcomings that arise in the plans for a product's creation. More specifically, a 'materials' defect is a failing in the quality of the actual substances used to make a product […] while] a 'design' defect is a flaw inherent in the product's intended operation and construction." *Id.* at 121. The court then concluded that Ford's choice of an insufficient coating "ha[d] all the trappings of a design defect." *Id.* at 123. It noted

that the "fundamental nature of the defect relate[d] to the 'overall plan of construction and operation' of the fuel tanks. The problem, as consistently described by [plaintiff], was not a low-quality supply of the A35 and A36 coatings or a problem in the process for applying them to Ford's fuel tanks; rather, it was Ford's plan to use those coatings at all in constructing its fuel tanks." *Id.* (quoting *Lombard*, 261 F.2d at 338). The court therefore held that because the defect at issue arose from Ford's *choice* to use the A35 and A36 coating in its fuel tanks, the defect was not a defect in "factory-supplied materials" and was not covered by Ford's express warranty. *Id.*

The United States Court of Appeals for the Ninth Circuit reached the same conclusion in *Troup v. Toyota Motor Corp.*, 545 F. App'x 668 (9th Cir. 2013). In *Troup*, the Ninth Circuit held that an express warranty that covered defects in "materials" did not cover a defect in vehicle gas tanks because the defect arose from the manufacturer's choice to use a particular resin in the tanks. *Id.* at 669. Many other federal courts have likewise held that defects arising from a manufacturer's *choice* of materials are not covered by similar warranties. *See*, *e.g.*, *Nelson v. Nissan North Am.*, 2014 WL 7331922, at ** 2-3 (D.N.J. Dec. 19. 2014) (citing *Lombard*, granting summary judgment on breach of express warranty claim in favor of automobile manufacturer, and holding that use of lead bushings that were "were particularly susceptible to [breakdown in] high heat" was not a defect in "materials,"

14

was a "design defect," and therefore was not covered by express warranty); *Amato*

*v. Subaru of America, Inc.*, 2019 WL 6607148, at *6 (D.N.J. Dec. 5, 2019)

(dismissing breach of express warranty claim where claim arose from "the materials

and type of process chosen to manufacture the alleged defective parts of the class

vehicle" and where alleged defect "resulted from the type of material used to case

the engine pistons, which utilized a less expensive manufacturing process").[4] *Cf.*

*Bruce-Martin Construction, Inc. v. CTB Inc.*, 735 F.3d 750, 753-54 (8th Cir. 2013)

---

[4] *See also Milman v. FCA US, LLC*, 2018 WL 5867481, at ** 2, 5-6 (C.D. Cal. Aug. 30, 2018) (dismissing breach of express warranty claim and holding that FCA's decision to use "soy-or-bio based wiring" insulation that allegedly "compromise[ed] the integrity" of vehicles' electrical system because it attracted "rodents and other animals and pests" was not a defect in "material" in part because plaintiffs did not "allege that any individual wire or component was anomalously defective"); *Haag v. Hyundai Motor Am.*, 294 F.Supp.3d 102, 105 (W.D.N.Y. 2018) (granting summary judgment on breach of express warranty claim and explaining that "well-settled precedent" establishes that defect arising "from the intentional use of inferior or defective materials" is a "design defect" and not a defect in "materials"); *Davidson v. Apple, Inc.*, 2017 WL 976048, at *11 (N.D. Cal. Mar. 14, 2017) (dismissing breach of express warranty claim and holding that "[a] manufacturer's choice to use a certain material to construct a product is [...] not a defect in 'materials and workmanship'"). *Burch v. Whirlpool Corp.*, 2017 WL 7370988, at *4 (W.D. Mich. 2017) (concluding that plaintiff failed to state a breach of express warranty claim where warranty covered "defects in materials," and where manufacturer "chose to manufacture [] rack adjusters] from [a] type of plastic" that was "brittle" and " failed when repeatedly exposed to high temperatures," because defect arose from manufacturer's choice of plastic, not a defect in the plastic itself); *Heater v. Gen. Motors, LLC*, 568 F.Supp.3d 626, 635 (N.D.W.Va. 2021) (explaining that "a manufacturer's choice of certain materials to construct a product is a 'design decision,' not a defect in 'materials and workmanship'"); *Hansen v. Vista Outdoor Inc.*, 2018 WL 9918096, *4 (N.D. Iowa 2018) (granting summary judgment because assertion "that 416R steel is inherently flawed and that the choice to use 416R steel constitutes a defect ... is a design defect claim, not a manufacturing defect claim").

(citing *Lombard*, affirming summary judgment in favor of construction company on breach of express warranty claim, and explaining that where "the design was defective in calling for unsuitable materials," the defect was not a defect in "material or workmanship").

Player and Fernandez have not cited a single decision in which any court has held that a warranty covering defects in "material" applies to a defect that results from a manufacturer's *choice* of insufficient material.   Instead, Player and Fernandez cite decisions in which courts have denied motions to dismiss breach of express warranty claims on the ground that, at the pleadings stage, it was impossible to determine whether the alleged defect was one in "material." *See*, *e.g.*, *Francis v. General Motors*, 504 F.Supp.3d 659, 673 (E.D. Mich. 2020) (denying motion to dismiss breach of warranty claim, noting that plaintiffs stated "facts consistent with a defect that could be due either to poor design, or to poor materials and workmanship," and explaining that "[t]he revelation of [which kind of defect] may be the culprit here must await development of the record"); *Gregorio v. Ford Motor Co.*, 522 F.Supp.3d 264, (E.D. Mich. 2021) (same).  Those cases do not apply here because discovery has been completed and, as explained above, the record makes clear that the Panel Defect arose from FCA's choice of a material that was insufficient to perform its assigned task, not from a material that was, itself, tainted or flawed.

In sum, because the Panel Defect was caused by FCA's choice of Belleville C10 – and not from any flaw in the Belleville C10 material itself – the defect is one of design, not one in "material," and it therefore is not covered by the Express Warranty. Accordingly, FCA is entitled to summary judgment on Player's and Fernandez's claim for breach of the Express Warranty.

## B

### 1

Player and Fernandez counter that notwithstanding the body of caselaw discussed above, there is a material factual dispute as to whether the Express Warranty covers the Panel Defect. The evidence that creates that dispute, according to Player and Fernandez, includes repeated admissions by FCA and its employees that the Express Warranty does cover the Panel Defect ("FCA's Purported Admissions"). Player and Fernandez highlight the following proof of those admissions:

- Deposition testimony by Saurabh Kumar, a corporate representative produced by FCA under Rule 30(b)(6), that the Panel Defect is "covered under" the Express Warranty. (Kumar Dep., ECF No. 73-8, PageID.3450-3451.)

- Internal FCA documents that describe how defective "front console side panels and door[s]" were "being replaced *in warranty* for delamination." (ECF No. 73-20, PageID.3592 (emphasis added). *See also* ECF No. 73-14, PageID.3533 (same); ECF No. 73-3631 (noting that "Door Trim Panels are being replaced in warranty for foam delamination."))

- Testimony that FCA was, in fact, providing customers repairs of the Panel Defect under the Express Warranty. (*See* Kumar Dep., ECF No. 73-8, PageID.3451.)

- An FCA engineer wrote that the Panel Defect is "a quality issue, not a design issue." (ECF No. 73-15, PageID.3543.)

On first blush, it may seem that FCA's Purported Admissions must preclude summary judgment in favor of FCA on Player's and Fernandez's express warranty claims. But first blushes can be deceiving.

## 2

FCA's Purported Admissions do not preclude summary judgment because they do not plug the fatal hole in Player's and Fernandez's breach of express warranty claims.  As explained above, under settled law, the Express Warranty's coverage for defects in "material" covers only defects caused by material that was, itself, flawed, and FCA's Purported Admissions are not evidence that the material used by FCA – *i.e.*, the Belleville C10 – was tainted in any way.  Indeed, notwithstanding those admissions, counsel for Player and Fernandez conceded at the hearing before the Court that there is *no evidence* in the record that the Belleville C10 was less than perfect.  In short, FCA's subjective belief that the Express Warranty covered the Panel Defect – as expressed in FCA's Purported Admissions – is no substitute for the missing proof that is essential to establish that the warranty covered the defect: namely, proof that the material used by FCA was, itself, defective.

18

A simple hypothetical helps to illustrate the point.  Imagine that an automaker issued an express warranty for a vehicle that identified "the brakes" as the only covered component.   Then imagine that the automaker received a flood of complaints about the air conditioning units in the vehicle and, further, that the automaker then both said that its warranty covered the air conditioning problems and proceeded to fix those problems under the warranty.  Surely, nobody would contend that the automaker's statements and actions actually bring the air conditioning defect within express terms of the brakes-only warranty.  The same is true with the Panel Defect here.

### 3

To be sure, there could have been some scenarios under which FCA's Purported Admissions may have been sufficient to stave off summary judgment on Plaintiffs' breach of warranty claims.  But none of those scenarios are at play here.

To begin, FCA's Purported Admissions could perhaps have provided some support to a claim that FCA was estopped from denying that the Express Warranty covered the Panel Defect.  But Player and Fernandez have not pleaded or advanced any estoppel theory here.   And it seems doubtful that they could have done so because there is no indication that they relied to their detriment on any of FCA's Purported Admissions. *See Long v. Knox*, 291 S.W.2d 292, 295 (Tex. 1956)

19

(describing reliance as an element of equitable estoppel under Texas law); *Miami Gardens, Inc. v. Conway*, 102 So. 2d 622, 626 (Fla. 1958) (same under Florida law).

Likewise, FCA's Purported Admissions perhaps could have supported a claim of mutual mistake – a claim that both FCA and Plaintiffs erroneously believed that the Express Warranty covered the Panel Defect and that the warranty should therefore be reformed to reflect that joint error.  But as counsel for Player and Hernandez acknowledged at the hearing before the Court, they have not pleaded a claim for mutual mistake.  Likewise, they do not seek reformation of the Express Warranty – not even as an alternative request for relief.

Finally, FCA's Purported Admissions could perhaps have been relevant if there was some ambiguity related to the Express Warranty.  If that was the case, then the admissions could have been useful in fleshing out the meaning of the warranty.  But there was no ambiguity in the Express Warranty.

There are two types of contractual ambiguities: "patent" and "latent." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).  "A patent ambiguity is evident on the face of the contract." *Id.*  In contrast, [a] latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter." *Id.*  "For example, if a contract called for goods to be delivered to 'the green house on Pecan Street,' and there were in fact two green

houses on the street, it would be latently ambiguous." *Id.* at n.4.   Where some "collateral matter" reveals a latent ambiguity in a contract, then "parol evidence is admissible for the purpose of ascertaining the true intention of the parties as expressed in the agreement." *Id.*[5]

There is no patent ambiguity in the Express Warranty with respect to whether it covered defects like the Panel Defect.  As set forth in detail above, numerous courts have examined the relevant language in the Express Warranty – coverage for defects in "material" – and have uniformly concluded that that language does not provide coverage for defects that arise from a manufacturer's choice of insufficient materials. The case law simply does not allow for the possibility that the language of the Express Warranty covers the Panel Defect.  Thus, Player and Fernandez cannot use a theory of patent ambiguity to justify their reliance on FCA's Purported Admissions.

Likewise, there is no latent ambiguity in the Express Warranty that would permit consideration of FCA's Purported Admissions.  As noted above, a latent ambiguity must be established by a "matter" that is "collateral" to a contract, and

---

[5] Florida law concerning contractual ambiguities is the same as the Texas law set forth above.  Indeed, the Florida Supreme Court has cited with approval the example of latent ambiguity provided by the Texas Supreme Court in the case law cited above. *See Deni Assoc. of Florida, Inc v. State Farm Fire and Cas. Ins. Co.*, 711 So.2d 1135, 1139-40 (Fla. 1998). *See also Whitfield v. Webb*, 131 So. 786, 788 (Fla. 1931) (setting forth rules concerning latent ambiguities).

Player and Fernandez have not cited any such matter with respect to the Express Warranty. Thus, they may not invoke FCA's Purported Admissions under a theory of latent ambiguity. ‼

## V

For all of the reasons explained above, the Court concludes that because the Panel Defect is not covered by the Express Warranty, FCA did not breach that warranty when it allegedly failed to repair Player's and Fernandez's door and console panels. FCA's motion for summary judgment (ECF No. 65) is therefore **GRANTED**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated: March 1, 2024        UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 1, 2024, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126